1 Douglas J. Dennington (State Bar No. 173447)
ddennington@rutan.com
2 Jayson Parsons (State Bar No. 330458)
jparsons@rutan.com
3 RUTAN & TUCKER, LLP
18575 Jamboree Road, 9th Floor
4 Irvine, CA 92612
Telephone: 714-641-5100
5 Facsimile: 714-546-9035

6 Attorneys for Plaintiffs

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11 GHP MANAGEMENT
CORPORATION, a California
12 corporation; 918 BROADWAY
ASSOCIATES, LLC, a Delaware limited
13 liability company dba "Broadway Palace
Apartments;" LR 9th & BROADWAY,
14 LLC, a California limited liability
company dba "Broadway Palace
15 Apartments;" PALMER TEMPLE
STREET PROPERTIES, LLC, a
16 California limited liability company dba
"The Da Vinci Apartments;"
17 PALMER/CITY CENTER II, L.P., a
California limited partnership dba "The
18 Da Vinci Apartments;" PALMER
BOSTON STREET PROPERTIES I,
19 L.P., a Delaware limited partnership dba
"The Orsini;" PALMER BOSTON
20 STREET PROPERTIES II, L.P., a
Delaware limited partnership dba "The
21 Orsini;" PALMER BOSTON STREET
PROPERTIES III, L.P., a California
22 limited partnership dba "The Orsini;"
BRIDEWELL PROPERTIES, L.P., a
23 California limited partnership dba
"Pasadena Park Place;" PALMER ST.
24 PAUL PROPERTIES, L.P., a California
limited partnership dba "The Piero
25 Apartments;" PALMER/SIXTH
STREET PROPERTIES, L.P., a
26 California limited partnership dba "The
Piero Apartments;" FIGTER LTD., a
27 California limited partnership dba
"Skyline Terrace Apartments;"
28 WARNER CENTER SUMMIT, LTD, a
California limited partnership dba

Case No.

Judge:

**COMPLAINT FOR:**

**1) UNCOMPENSATED PER SE PHYSICAL TAKING IN VIOLATION OF THE 5TH AMENDMENT TO UNITED STATES CONSTITUTION (42 U.S.C. § 1983);**

**2) UNCOMPENSATED REGULATORY TAKING IN VIOLATION OF THE 5TH AMENDMENT TO UNITED STATES CONSTITUTION (42 U.S.C. § 1983); AND**

**3) UNCOMPENSATED TAKING IN VIOLATION OF ARTICLE I, SECTION 19 OF CALIFORNIA CONSTITUTION.**

**JURY TRIAL DEMANDED FOR BOTH LIABILITY AND DAMAGES PER CITY OF MONTEREY V. DEL MONTE DUNES MONTEREY, LTD., 526 U.S. 687 (1999)**

1   "Summit at Warner Center;"
    PALMER/THIRD STREET
2   PROPERTIES, L.P., a California limited
    partnership dba "The Visconti
3   Apartments",

4           Plaintiffs,

5       vs.

6   CITY OF LOS ANGELES; and DOES
    1-25, INCLUSIVE,
7
            Defendants.
8

9           Plaintiffs GHP MANAGEMENT CORPORATION, a California corporation;

10  918 BROADWAY ASSOCIATES, LLC, a Delaware limited liability company dba

11  "Broadway Palace Apartments;" LR 9TH & BROADWAY, LLC, a California

12  limited liability company dba "Broadway Palace Apartments;" PALMER TEMPLE

13  STREET PROPERTIES, LLC, a California limited liability company dba "The Da

14  Vinci Apartments;" PALMER/CITY CENTER II, A CALIFORNIA LIMITED

15  PARTNERSHIP, a California limited partnership dba "The Da Vinci Apartments;"

16  PALMER BOSTON STREET PROPERTIES I, LP, a Delaware limited partnership

17  dba "The Orsini;" PALMER BOSTON STREET PROPERTIES II, LP, a Delaware

18  limited partnership dba "The Orsini;" PALMER BOSTON STREET PROPERTIES

19  III, A CALIFORNIA LIMITED PARTNERSHIP, a California limited partnership

20  dba "The Orsini;" BRIDEWELL PROPERTIES, LIMITED, A CALIFORNIA

21  LIMITED PARTNERSHIP, a California limited partnership dba "Pasadena Park

22  Place;" PALMER ST. PAUL PROPERTIES, LP, a Delaware limited partnership

23  dba "The Piero Apartments;" PALMER/SIXTH STREET PROPERTIES, L.P., a

24  California limited partnership dba "The Piero Apartments;" FIGTER LIMITED, A

25  CALIFORNIA LIMITED PARTNERSHIP, a California limited partnership dba

26  "Skyline Terrace Apartments;" WARNER CENTER SUMMIT, LTD,, A

27  CALIFORNIA LIMITED PARTNERSHIP, a California limited partnership dba

28

Rutan & Tucker, LLP
attorneys at law

2590/036892-0001
16615306.5 a08/04/21                    -2-              COMPLAINT FOR REGULATORY TAKING

"Summit at Warner Center;" and PALMER/THIRD STREET PROPERTIES, L.P., a California limited partnership dba "The Visconti Apartments," (collectively, "Plaintiffs") allege as follows:

## INTRODUCTION

1. At the outset of the COVID-19 pandemic ("Pandemic") in March 2020, Defendant City of Los Angeles ("City") hastily instituted a series of ordinances (the "Eviction Moratorium") prohibiting lessors and landlords, such as Plaintiffs, from bringing unlawful detainer actions against tenants who refused to pay rent on the grounds that they had been impacted by the Pandemic.

2. The Eviction Moratorium, among other things, contains provisions that *indefinitely* prohibit landlords and property owners from initiating (or continuing to prosecute existing) residential eviction proceedings premised upon the non-payment of rent. Lessors were (and still are) forbidden not only from commencing eviction proceedings for a tenant's failure to pay contractual rent, but from charging any late fees or interest to which they were entitled. Under the Eviction Moratorium, tenants may continue to occupy their respective premises at no charge, utilizing the water, power, trash, sewage, and other fees that the landlords must continue to pay without reimbursement. By stripping all remedies away from owners — and without requiring tenants to demonstrate an inability to pay rent — the Eviction Moratorium discouraged (and continues to discourage) tenants who can pay all or some of what they owe from doing so.

3. The Eviction Moratorium also provides tenants a full twelve months following expiration of the "Local Emergency Period" — itself a moving target — to repay back rent, irrespective of the tenant's ability to pay some or all rent, the term of the lease, any agreed plan or schedule for repayment, or any evidence demonstrating that the tenant will actually be capable of paying back rent at the expiration of the one-year grace period. For the vast majority of "qualifying" tenants, the "rent deferral" provision will operate as rent forgiveness, as it is

unlikely that tenants who do not pay rent during the Local Emergency Period will be in a position to pay back rent, in addition to their current rent, at the conclusion of the grace period (whenever that may be).  Indeed, as one federal District Court has already found, notwithstanding the provisions in eviction moratoria providing that tenants remain obligated to pay rent at some distant point in the future, "*this right is largely illusory*, as tenants who have not paid their rent for many months because of economic distress — or indeed for any other reason — are *unlikely to pay a money judgment against them*." *Baptiste v. Kennealy,* 490 F.Supp.3d 353, 376 (D. Mass. 2020) (emphasis added).  Indeed, the Eviction Moratorium prevents owners, like Plaintiffs, from pursuing their *only available remedy* to replace a nonpaying tenant with a paying tenant.  Every month a landlord is prevented from renting its unit to a *paying tenant* is a month for which the landlord has permanently been deprived of its fundamental right to exclude defaulting tenants from its property and for which the landlord will be forever deprived of the ability to mitigate losses by re-letting the premises to a paying tenant.  The Eviction Moratorium forces owners to allow tenants who have stopped paying — and may never pay again — to continue to occupy their units for what will amount to "years" after the initial onset of the Pandemic.

4.     The Eviction Moratorium also fails to address how a landlord or property owner would actually be able to collect rent from those tenants, like a substantial number of Plaintiffs' tenants, who take advantage of the Eviction Moratorium, but move to a different location prior to the expiration of the Eviction Moratorium, or prior to the one-year grace period afforded to tenants under the Eviction Moratorium.  While owners can theoretically sue such tenants for back rent at some distant point in the future (but not *ever* for any interest or late fees), their likelihood of actually collecting on a judgment is minimal, at best, and that assumes the landlord can even locate and serve the departing tenant by the time landlords are free to institute collection proceedings against tenants in the City.  As for those

1  tenants who move prior to the time owners may sue to recover back rent, there is no

2  realistic chance to recover such rent and, even if there were, the owner would incur

3  tremendous (and as a practical matter unrecoverable) litigation expenses just to

4  recover that to which the owner is already entitled.

5        5.    The Eviction Moratorium further prohibits all evictions based on the

6  presence of unauthorized occupants or pets, as well as for undefined "nuisance[s]

7  related to COVID-19."

8        6.    The Eviction Moratorium further indefinitely prohibits all "no-fault"

9  evictions during the indefinite and now sustained duration of the Eviction

10  Moratorium, such as evictions needed for owners intending to withdraw their

11  properties from the rental market, evictions needed for owners (or family members)

12  who intend to personally occupy the premises, and any other "no fault" eviction as

13  defined in Cal. Civ. Proc. Code § 1946.2(b).  The Eviction Moratorium also

14  indefinitely prohibits "at fault" evictions such as those needed to eliminate a

15  nuisance if the nuisance is in any way related to the Pandemic.

16        7.    Plaintiffs are the owners of numerous apartment communities located

17  within the City, and have suffered astronomical rent losses and related financial

18  losses attributable to the Eviction Moratorium.  Plaintiffs have suffered rent losses

19  well in excess of $20 Million, to date, which losses are anticipated to increase

20  significantly by the time the Eviction Moratorium, and the one-year grace periods

21  afforded to tenants, expire.  In addition, Plaintiffs have suffered related financial

22  losses attributable to the refusal of lending institutions to finance and/or refinance

23  loans on Plaintiffs' apartment community properties, specifically on account of the

24  Eviction Moratorium.

25        8.    As set forth below, Plaintiffs assert that the Eviction Moratorium

26  effected an uncompensated taking of private property in violation of the Fifth

27  Amendment to the United States Constitution and Article I, Section 19 of the

28  California Constitution, entitling Plaintiffs to payment of just compensation in an

1  amount in excess of $100,000,000, according to proof.

2  **PARTIES**

3  9.     Plaintiff GHP MANAGEMENT CORPORATION is a corporation

4  organized and existing under the laws of California, and at all relevant times herein,

5  managed (and currently manages) the apartment communities owned by the other

6  named Plaintiffs in this action.

7  10.     Plaintiff 918 BROADWAY ASSOCIATES, LLC is a limited liability

8  company organized and existing under the laws of the State of Delaware, doing

9  business as "Broadway Palace Apartments" ("918 Broadway").  918 Broadway

10  owns fee title to the real property located at 928 S. Broadway, Los Angeles,

11  California 90015, which is improved with a 413-unit luxury apartment community.

12  The 918 Broadway apartment community, also known as "Broadway Palace North,"

13  is located within the City's territorial limits and, thus, is subject to the Eviction

14  Moratorium.  Numerous tenants occupying the "Broadway Palace North"

15  community have taken advantage of the Eviction Moratorium to withhold payment

16  of rent.  As of the filing of this Complaint, the rent losses suffered by 918 Broadway

17  total approximately $1,353,000.  The total rent losses are anticipated increase

18  significantly by the time the Eviction Moratorium, and the one-year grace period

19  afforded to tenants under the Eviction Moratorium, expire.

20  11.     Plaintiff LR 9th & BROADWAY LLC is a limited liability company

21  organized and existing under the laws of the State of California, doing business as

22  "Broadway Palace Apartments" ("Broadway").  Broadway owns fee title to the real

23  property located at 1026 S. Broadway, Los Angeles, California 90015, which is

24  improved with a 236-unit apartment community.  The apartment community, also

25  known as "Broadway Palace South," is located within the City's territorial limits

26  and, as such, is subject to the Eviction Moratorium.  Many of the tenants occupying

27  the "Broadway Palace South" community have taken advantage of the Eviction

28  Moratorium to withhold payment of rent during the course of the Pandemic.  As of

the filing of this Complaint, the rent losses suffered by Broadway total approximately $774,000.  The total rent losses to be sustained by Broadway are anticipated to increase significantly by the time the Eviction Moratorium, and the one-year grace period afforded to tenants under the Eviction Moratorium, expire.

12.     Plaintiff PALMER TEMPLE STREET PROPERTIES LLC, is a limited liability company organized and existing under the laws of the State of California, doing business as "The Da Vinci Apartments" ("PTSP").  At all relevant times, PTSP owned fee title to the real property located at 909 W. Temple Street, Los Angeles, California 90012, which is improved with a 526-unit apartment community.  The PTSP apartment community, also known as "The Da Vinci," is located within the City's territorial limits and, as such, is subject to the Eviction Moratorium.  Numerous tenants occupying The DaVinci took advantage of the Eviction Moratorium to withhold payment of rent during the course of the pandemic.  As of the filing of this Complaint, the rent losses suffered by PTSP total approximately $2,766,000.  The total rent losses to be sustained by PTSP are anticipated to increase significantly by the time the Eviction Moratorium, and the one-year grace period afforded to tenants under the Eviction Moratorium, expire.

13.     Plaintiff PALMER/CITY CENTER II, A CALIFORNIA LIMITED PARTNERSHIP, is a California limited partnership organized and existing under the laws of the State of California, doing business as "the Medici Apartments" ("Palmer/City Center").  Palmer/City Center own fee title to the real property located at 722 Bixel Street, Los Angeles, California 90017, which is improved with a 632-unit apartment community.  The Palmer/City Center apartment community, also known as "The Medici," is located within the City's territorial limits and, as such, is subject to the Eviction Moratorium.  Numerous tenants occupying The Medici community took advantage of the Eviction Moratorium to withhold payment of rent during the course of the pandemic.  As of the filing of this Complaint, the rent losses suffered by Palmer/City Center total approximately $2,747,000.  The

1  total rent losses to be sustained by Palmer/City Center are anticipated to increase
2  significantly by the time the Eviction Moratorium, and the one-year grace period
3  afforded to tenants under the Eviction Moratorium, expire.

4      14.    Plaintiff PALMER BOSTON STREET PROPERTIES I, LP, is a
5  limited partnership organized and existing under the laws of the State of Delaware,
6  doing business as "The Orsini" ("Palmer Boston Street I").  Palmer Boston Street I
7  owns fee title to the real property located at 505 N. Figueroa Street, Los Angeles,
8  California 90012, which is improved with a 296-unit apartment community.  The
9  apartment community, also known as "Orsini I," is located within the territorial
10 limits of the City and, as such, is subject to the Eviction Moratorium.  Numerous
11 tenants occupying the Orsini I community took advantage of the Eviction
12 Moratorium to withhold payment of rent during the course of the pandemic and are
13 continuing to withhold rental payments even today.  As of the filing of this
14 Complaint, the rent losses suffered by Palmer Boston Street I total approximately
15 $2,796,000.  The total rent losses to be sustained by Palmer Boston Street I are
16 anticipated to increase significantly by the time the Eviction Moratorium, and the
17 one-year grace period afforded to tenants under the Eviction Moratorium, expire.

18     15.    Plaintiff PALMER BOSTON STREET PROPERTIES II, LP, is a
19 limited partnership organized and existing under the laws of the State of Delaware,
20 doing business as "The Orsini" ("Palmer Boston Street II").  Palmer Boston Street II
21 owns fee title to the real property located at 550 North Figueroa Street, Los Angeles,
22 California 90012, which is improved with a 566-unit apartment community.  The
23 apartment community, also known as "Orsini II," is located within the territorial
24 limits of the City and, as such, is subject to the Eviction Moratorium.  Numerous
25 tenants occupying the Orsini II apartment community took advantage of the
26 Eviction Moratorium to withhold payment of contractual rent during the course of
27 the Pandemic.  As of the filing of this Complaint, the rent losses suffered by
28 Palmer/Boston Street II total approximately $2,925,000.  The total rent losses to be

1   sustained by Palmer/Boston Street II are anticipated to increase significantly by the

2   time the Eviction Moratorium, and the one-year grace period afforded to tenants

3   under the Eviction Moratorium, expire.

4         16.    Plaintiff PALMER BOSTON STREET PROPERTIES III, A

5   CALIFORNIA LIMITED PARTNERSHIP is a limited partnership organized and

6   existing under the laws of the State of California, doing business as "The Orsini"

7   ("Palmer Boston Street III").  Palmer Boston Street III owns fee title to the real

8   property located at 606 North Figueroa Street, Los Angeles, California, which is

9   improved with a 210-unit apartment community.  The apartment community, also

10  known as "Orsini III," is located within the territorial limits of the City and, as such,

11  is subject to the Eviction Moratorium.  Numerous tenants occupying the Orsini III

12  community have taken advantage of the Eviction Moratorium to withhold payment

13  of contractual rent during the course of the Pandemic.  As of the filing of this

14  Complaint, the rent losses suffered by Palmer Boston Street III total approximately

15  $1,421,000.  The total rent losses to be sustained by Palmer Boston Street III are

16  anticipated to increase significantly by the time the Eviction Moratorium, and the

17  one-year grace period afforded to tenants under the Eviction Moratorium, expire.

18        17.    Plaintiff BRIDEWELL PROPERTIES, LIMITED, A CALIFORNIA

19  LIMITED PARTNERSHIP is a limited partnership organized and existing under the

20  laws of the State of California, doing business as "Pasadena Park Place"

21  ("Bridewell").  Bridewell owns fee title to the real property located at 101 Bridewell

22  Street, Los Angeles, California 90042, which is improved with a 128-unit apartment

23  community.  The apartment community is located within the territorial limits of the

24  City and, as such, is subject to the Eviction Moratorium.  Numerous tenants

25  occupying the apartment community have taken advantage of the Eviction

26  Moratorium to withhold payment of contractual rent during the course of the

27  Pandemic.  As of the filing of this Complaint, the total rent losses suffered by

28  Bridewell exceeds $74,000.  The total rent losses to be sustained by Bridewell is

anticipated to increase significantly by the time the Eviction Moratorium, and the one-year grace period afforded to tenants under the Eviction Moratorium, expire.

18.    Plaintiff PALMER ST. PAUL PROPERTIES, LP, is a limited partnership organized and existing under the laws of the State of Delaware, doing business as "The Piero Apartments" ("Palmer St. Paul").  Palmer St. Paul owns fee title to the real property located at 616 South St. Paul Avenue, Los Angeles, California 90017, which is improved with a 225-unit apartment community.  The apartment community, also known as "Piero I," is located within the City and, as such, is subject to the Eviction Moratorium.  Numerous tenants occupying the apartment community have taken advantage of the Eviction Moratorium to withhold payment of rent during the course of the Pandemic.  As of the filing of this Complaint, the total rent losses suffered by Palmer St. Paul exceed $1,213,000.  The total rent losses to be sustained by the Palmer St. Paul are anticipated to increase significantly by the time the Eviction Moratorium, and the one-year grace period afforded to tenants under the Eviction Moratorium, expire.

19.    Plaintiff PALMER/SIXTH STREET PROPERTIES, L.P., is a limited partnership organized and existing under the laws of the State of California, doing business as "The Piero Apartments" ("Palmer/Sixth Street").  Palmer/Sixth Street owns fee title to the real property located at 609 St. Paul Avenue, Los Angeles, California 90017, which is improved with a 335-unit apartment community.  The apartment community, also known as "Piero II," is located within the City and, as such, is subject to the Eviction Moratorium.  Numerous tenants occupying the Piero II community have taken advantage of the Eviction Moratorium to withhold the payment of contractual rent during the course of the Pandemic.  As of the filing of this Complaint, the total rent losses suffered by Palmer/Sixth Street exceed $1,432,000.  The total rent losses to be sustained by Palmer/Sixth Street are anticipated to increase significantly by the time the Eviction Moratorium, and the one-year grace period afforded to tenants under the Eviction Moratorium, expire.

20.     Plaintiff FIGTER LIMITED, A CALIFORNIA LIMITED PARTNERSHIP is a limited partnership organized and existing under the laws of the State of California, doing business as "Skyline Terrace Apartments" ("Figter"). Figter owns fee title to the real property located at 930 Figueroa Terrace, Los Angeles, California 90012, which is improved with a 198-unit apartment community.  The apartment community, also known as "Skyline Terrace," is located within the City and, as such, is subject to the Eviction Moratorium.  As of the filing of this Complaint, the rent losses suffered by Figter total approximately $400,000. The total rent losses to be sustained by Figter are anticipated to increase significantly by the time the Eviction Moratorium, and the one-year grace period afforded to tenants under the Eviction Moratorium, expire.

21.     Plaintiff WARNER CENTER SUMMIT, LTD., A CALIFORNIA LIMITED PARTNERSHIP is limited partnership organized and existing under the laws of the State of California, doing business as "Summit at Warner Center" ("Summit").  Summit owns fee title to the real property located at 22219 Summit Vue Lane, Woodland Hills, California 91367, which is improved with a 760-unit apartment community.  The apartment community, also known as "Summit at Warner Center," is located within the Woodland Hills community in the territorial limits of the City and, as such, is subject to the Eviction Moratorium.  Numerous tenants occupying units within the Summit at Warner Center have taken advantage of the Eviction Moratorium to withhold the payment of contractual rent during the course of the Pandemic.  As of the filing of this Complaint, the rent losses suffered by Summit total approximately $3,895,000.  The total rent losses to be sustained by Summit are anticipated to increase significantly by the time the Eviction Moratorium, and the one-year grace period afforded to tenants under the Eviction Moratorium, expire.

22.     Plaintiff PALMER/THIRD STREET PROPERTIES, L.P., is a limited partnership organized and existing under the laws of the State of California, doing

business as "The Visconti Apartments" ("Palmer/Third Street").  Palmer/Third Street owns fee title to the real property located at 1221 West 3rd Street, Los Angeles, California 90017, which is improved with a 297-unit apartment community.  The apartment community, known as "The Visconti," is located within the City and, as such, is subject to the Eviction Moratorium.  Numerous tenants have taken advantage of the Eviction Moratorium to withhold the payment of contractual rent during the course of the Pandemic.  As of the filing of this Complaint, the rent losses suffered by Palmer/Third Street total approximately $982,000.  The total rent losses to be sustained by the Palmer/Third Street are anticipated to increase significantly by the time the Eviction Moratorium, and the one-year grace period afforded to tenants under the Eviction Moratorium, expire.

*The Defendants*

23.    Defendant City of Los Angeles is a charter city organized and existing under the laws of the State of California.

24.    Plaintiffs do not know the true names and capacities of Defendants Does 1 through 25, inclusive, and therefore sues them by their fictitious names.  Plaintiffs allege that Defendants Does 1 through 25, inclusive, are jointly, severally and/or concurrently liable and responsible for the injuries set forth herein, acting on their own or as the agents of named Defendants.  Plaintiffs will amend this Complaint to insert the true names of the fictitiously-named Defendants when the same are ascertained.

25.    Plaintiffs are informed and believe and thereon allege that each Defendant was the agent and/or employee of every other Defendant, and at all times relevant hereto was acting within the course and scope of said agency and/or employment.

**JURISDICTION AND VENUE**

26.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under 42 U.S.C. § 1983 in relation to

1  Defendants' deprivation of Plaintiffs' constitutional rights under the Fifth and

2  Fourteenth Amendments to the United States Constitution.

3       27.    The Court has supplemental jurisdiction over Plaintiffs' claims asserted

4  under the Constitution of the State of California pursuant to 28 U.S.C. § 1367(a),

5  because Plaintiffs' state constitutional claims arise from the same nucleus of

6  operative facts as its federal claims and thus form part of the same case or

7  controversy under Article III of the United States Constitution.

8       28.    The Central District of California is the appropriate venue for this

9  action pursuant to 28 U.S.C. § 1391(b)(1) and (2), because it is a District in which

10  Defendants reside, maintain offices, exercise their authority in their official

11  capacities, and have enforced the orders at issue in this case.  While the Central

12  District of California is an appropriate venue for this action by statute, given the

13  sweeping breadth of the Eviction Moratorium and the strong likelihood that a

14  significant portion of the jury pool have been personally impacted by the Eviction

15  Moratorium, Plaintiffs have filed this proceeding in the Central District of

16  California, without waiver of their right to apply for a change in venue, if

17  appropriate.

18  **FACTUAL ALLEGATIONS**

19  **State and Local Government Response to Pandemic Re Evictions**

20       29.    During the early days of the Pandemic, the State and local governments

21  enacted a flurry of executive orders and regulations relating to evictions, as alleged

22  in more detail herein below.

23  *The State's Response*

24       30.    On <u>March 4, 2020</u>, Governor Newsom issued a "State of Emergency"

25  Order to address the threat of the spread of the Pandemic throughout California's

26  communities.

27       31.    On <u>March 16, 2020</u>, Governor Newsom issued Executive Order N-28-

28  20 authorizing local governments to halt evictions of tenants.  In relevant part, the

Order suspended provisions of state law that would "preempt or otherwise restrict a local government's exercise of its police power to impose substantive limits on residential or commercial evictions," but only to the extent that "[t]he basis for the eviction is nonpayment of rent . . . arising out of a substantial decrease in household or business income" caused by the Pandemic or the government response thereto. The Order also required that the decrease in income be "documented."  The Order initially provided that such protections would only be in effect through May 31, 2020.

32.     On March 27, 2020, Governor Newsom issued Executive Order N-37-20 restricting evictions though May 31, 2020, if certain conditions are met, including that the tenant has notified the landlord in writing of their "inability to pay the full amount due to reasons related to COVID-19," within 7 days of the date the rent is due.  The Order also required that tenants retain "verifiable documentation" explaining their changed financial circumstances, as an affirmative defense to an unlawful detainer action.

33.     On May 29, 2020, Governor Newsom issued Executive Order No. N-66-20, extending the eviction protections for an additional 60 days.

34.     On June 30, 2020, Governor Newsom issued Executive Order N-71-20, extending the timeframe for the protections provided by N-28-20 that authorized local governments to halt evictions for renters impacted by COVID-19 through September 30, 2020.

35.     On September 1, 2020, Governor Newsom signed Assembly Bill 3088 ("AB 3088") providing that, among other things, residential tenants who are unable to pay rent between March 1, 2020, and January 31, 2021, due to financial distress related to COVID-19 are protected from eviction, pursuant to certain requirements. AB 3088 provided that landlords could bring unlawful detainer actions against nonpaying tenants as of October 5, 2020, if a tenant failed to deliver a declaration stating their inability to pay due to COVID-19 distress.  Furthermore, AB 3088

required that residential tenants must, by January 31, 2021, pay at least 25 percent of rent owed for the months of October 2020 through January 2021.  Finally, AB 3088 provided that actions adopted by local governments between August 19, 2020, and January 31, 2021, to protect residential tenants from eviction due to financial hardship related to COVID-19 are temporarily preempted, where such actions would not become effective until February 1, 2021.

36.     On January 29, 2021, Governor Newsom signed Senate Bill 91 ("SB 91") into law, which extended AB 3088's eviction protections through June 30, 2021, as well as the temporary preemption of a local jurisdiction's ability to enact new or amend existing eviction protections.

37.     On June 28, 2021, Governor Newsom signed Assembly Bill 832 ("AB 832"), further extending the Statewide Moratorium through September 30, 2021.

38.     Pursuant to AB 3088, SB 91, and AB 832, tenants taking advantage of the statewide eviction moratorium are required to declare, under penalty of perjury, that they have been financially impacted by the Pandemic to the point where they are unable to pay rent.  In addition, tenants must pay, on or before September 30, 2021, 25% of their rental obligations that arose between September 1, 2020 and September 30, 2021.

*The City's Response*

39.     On March 15, 2020, Los Angeles Mayor Eric Garcetti issued a Public Order under the City of Los Angeles's Emergency Authority entitled "New City Measures to Address COVID-19."  Among other things, the Mayor's Order mandated that "no landlord shall evict a residential tenant in the City of Los Angeles during this local emergency period if the tenant is able to show an inability to pay rent due to circumstances related to the COVID-19 pandemic."  The Mayor's Order additionally provided that such circumstances include "loss of income due to a COVID-19 related workplace closure, child care expenditures due to school closures, health care expenses related to being ill with COVID-19 or caring for a

member of the tenant's household who is ill with COVID-19, or reasonable expenditures that stem from government-ordered emergency measures."  There were no provisions mandating any sort of documentation be retained by tenants who claim an inability to pay rent due to COVID-19.  Nor were there any protections provided for landlords or property owners rightfully attempting to continue collecting rent.

40.    On <u>March 27, 2020</u>, the City Council for Defendant City of Los Angeles enacted Ordinance No. 186585 ("City Moratorium") mandating a "temporary"[1] moratorium on evictions for non-payment of rent for tenants who are unable to pay rent due to circumstances related to the COVID-19 pandemic.

41.    On <u>March 31, 2020</u>, the City Moratorium was signed by the Mayor on March 31, 2020, but retroactively applied to "non-payment eviction notices, no-fault eviction notices, and unlawful detainer actions based on such notices, served or filed on or after March 4, 2020."  The City Moratorium applies to both commercial real property and residential real property, both of which are broadly defined in the ordinance.  The City Moratorium is not set to expire until "the end of the Local Emergency period."  The Local Emergency period is defined as the period of time from March 4, 2020 to the end of the local emergency as declared by the Mayor.

42.    On <u>May 6, 2020</u>, the City enacted Ordinance No. 186606 as an update to the City Moratorium.  The update includes a prohibition on the influencing or attempting to influence, "through fraud, intimidation or coercion, a residential tenant to transfer or pay to the Owner any sum received by the tenant as part of any government relief program."

43.    Importantly, when Governor Newsom signed into law the statewide moratorium, as originally adopted in AB 3088 and extended by way of SB 91 and AB 832, the City took the position that the City's Eviction Moratorium would

---

[1] The word "temporary" is somewhat misleading, as the Eviction Moratorium has no specified end date, and extends certain protections an additional 12-months beyond the "end of the Local Emergency."

control and that tenants residing in the City were not required to meet the attestation requirements and payment obligations embodied in the statewide moratorium.  The City did so on account of the fact that the statewide moratoria did not preempt local moratoria in effect as of August 20, 2020.

### *The California Courts' Response*

44.     On April 6, 2020, the California Judicial Council, the policymaking body of the California courts, issued temporary measures, including Rules 1 and 2, which effectively prohibited the bringing of unlawful detainer actions and judicial foreclosures.  This independent eviction moratorium expired on September 1, 2020.

### **The Present State of the City's Eviction Moratorium**

45.     The Eviction Moratorium at issue here continue to effectively precludes residential evictions, resulting in persistent physical occupation by defaulting tenants, as alleged in more detail herein below.

46.     The Eviction Moratorium presently prohibits landlords from terminating tenancies based on (1) non-payment of rent due to COVID-19 related inability to pay (without requiring documentation of such inability); (2) any "no fault" reason for termination; (3) certain lease violations related to unauthorized occupants, unauthorized pets, and nuisance; and (4) the Ellis Act[2].  The ordinance also allows for an extended repayment schedule–giving tenants up to 12-months after the end of the Local Emergency to repay the delayed rent, without any interest or late penalties having accrued.[3]  Further, while it provides that tenants "may" agree to a repayment plan, they are not required to do so.  Thus, a tenant who fails to pay rent during the emergency period can refuse to pay ***any*** of that back rent for another full year after the emergency order is lifted, before the landlord has any

---

[2] Landlords are prohibited from removing any occupied units from the rental market as would otherwise be allowed by the Ellis Act until 60 days after the end of the Local Emergency period.

[3] The ordinance prohibits an owner from charging interest or a late fee on rent not paid under its provisions.

recourse.  Nevertheless, the Eviction Moratorium purports to compel landlords and property owners to continue paying for the tenants' utilities, and to continue maintaining secure and habitable living units pursuant to the terms of the leases. The Eviction Moratorium fails to provide any protection for the property owners who are unable to pay their mortgages, utilities and operating expenses needed to continue providing habitable units to their tenants.

47.     While the Eviction Moratorium ostensibly protects tenants who are unable to pay rent due to circumstances related to the COVID-19 pandemic, it arbitrarily shifts the financial burden onto property owners, many of whom were already suffering financial hardship as a result of the Pandemic and have no equivalent remedy at law.

48.     Notably, the Eviction Moratorium *does not require* tenants to provide notice of COVID-19-related inability to pay to the landlord or to provide documentation to the landlord.  While the City provides an *optional* form tenants can use to notify their landlords of a COVID-19-related inability to pay, the form is not mandatory.  The City Moratorium nonetheless prohibits owners from endeavoring to evict any tenant with such an inability, in addition to providing that qualifying inability to pay serves as an affirmative defense to eviction for non-payment.

49.     The Eviction Moratorium fails to provide any tribunal or mechanism by which property owners and landlords may challenge a tenant's claimed "inability to pay," effectively forcing property owners to accept such claims without question. Indeed, the City Council did everything in its power to eliminate all judicial or non-judicial remedies available to property owners.

The City also created a private right of action in favor of tenants only, which allows tenants to sue their landlords for violating the Eviction Moratorium, after providing notice to the landlord and 15-day period to cure the violation.  A tenant may bring an action for civil penalties of up to $10,000 per violation (plus up to an

additional $5,000 if the tenant is senior citizen or disabled).  The private right of action applies from May 12, 2020 forward.  Thus, while landlords have been stripped of all remedies and any tribunal to adjudicate grievances, such as a court to protect their rights, tenants are free to go to court to assert monetary claims against their landlords.

### The Eviction Moratorium Has Resulted in Severe Hardship to Plaintiffs

50.     Plaintiffs own and operate 12 multifamily complexes throughout the City of Los Angeles.  As of the date of filing, Plaintiffs' tenants are in arrears to the tune of nearly $20,000,000.  Plaintiffs anticipate that this amount will at least triple by the time the City's Eviction Moratoria, and one-year grace period, expire.

51.     Plaintiffs contend that the Eviction Moratorium has actually and proximately caused rent losses in the amount of nearly $20 million, to date.  Had Plaintiffs retained the ability to institute unlawful detainer proceedings against any tenants that failed to timely pay per their contractual agreements, these losses would be minimal.  Plaintiffs would also have been able to replace defaulting tenants with other, paying tenants.  Presently, however, Plaintiffs have been required to allow defaulting tenants to accrue millions of dollars in back rents, and have been prevented from physically removing any defaulting tenants and replacing them with paying tenants.  In adopting the Eviction Moratoria, the City fully understood that tenants would not have the means to pay all back rent (to the tune of tens of thousands of dollars) by the time the Eviction Moratoria and one-year grace period expired.  Indeed, Plaintiffs are informed and believed, and based thereon allege, that the City orchestrated a regulatory regime designed to provide a compulsory and de facto rent forgiveness to be foisted on landlords throughout the City, including Plaintiffs.

52.     Each month that the Eviction Moratorium remains operative, Plaintiffs will continue to suffer lost rents as tenants continue to fail to pay, in conjunction with Plaintiffs' inability to physically remove defaulting tenants.

53.     In addition to rent losses, Plaintiffs have also suffered on the order of several millions of dollars in lost interest and late fees as a direct result of the Eviction Moratorium.

54.     Plaintiffs have also suffered related financial losses attributable to the refusal of lending institutions to finance and/or refinance loans on Plaintiffs' apartment community properties, specifically on account of the Eviction Moratorium.

55.     Plaintiffs are informed and believe and on that basis allege that they have suffered several millions of dollars in damages to their properties based on the Eviction Moratorium's compulsory mandate that Plaintiffs allow unauthorized individuals and pets, without limitation, to occupy Plaintiffs' properties against the will of Plaintiffs.

56.     The Eviction Moratorium has resulted in a severe diminution in value of Plaintiffs' properties in an amount to be proven at trial.

## FIRST CLAIM FOR RELIEF

### Uncompensated *Per Se* Physical Taking in Violation of the

### Fifth Amendment to the United States Constitution – 42 U.S.C. § 1983

### (*By Plaintiffs against All Defendants*)

57.     Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

58.     The Takings Clause of the Fifth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, provides that private property shall not "be taken for public use, without just compensation."  The purpose of the Takings Clause is to "bar [] Government from forcing some people alone to bear the public burdens which, in all fairness and justice, should be borne by the public as a whole." *Lingle v. Chevron Corp.*, 544 U.S. 528, 537 (2005) (quoting *Armstrong v. United States*, 364 U.S. 40, 49

1  (1960)).

2      59.    "When the government physically acquires private property for a public

3  use, the Takings Clause imposes a clear and categorical obligation to provide the

4  owner with just compensation." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063,

5  2071 (2021).  As the Supreme Court recently reaffirmed, the government commits a

6  physical taking when it either "formally condemn[s] property," "physically takes

7  possession of property without acquiring title to it," or "when it occupies property."

8  *Id.*  "These sorts of physical appropriations constitute the clearest sort of taking, and

9  [courts] assess them using a simple, *per se* rule: The government must pay for what

10  it takes." *Id.* (citations and quotation marks omitted).  This rule applies with equal

11  vigor regardless of whether the government "appropriat[es] private property for

12  itself or a third party." *Id.*

13      60.    The Supreme Court has also repeatedly reaffirmed that any "public

14  benefit" derived from a physical taking *is simply not relevant* to a court's takings

15  analysis: "[O]ur cases uniformly have found a taking to the extent of the occupation,

16  without regard to whether the action achieves an important public benefit or has

17  only minimal impact on the owner." *Loretto v. Teleprompter Manhattan CATV*

18  *Corp.,* 458 U.S. 419, 435 (1982).

19      61.    The Ordinances here fall squarely within the "physical occupation" line

20  of cases the United States Supreme Court has consistently held to constitute *per se*

21  categorical takings for which the government "must pay for what it takes." *Cedar*

22  *Point Nursery*, 141 S. Ct. at 2071.  The Eviction Moratorium requires that Plaintiffs

23  continue furnishing their properties — indefinitely — to defaulting and nonpaying

24  tenants.  Plaintiffs have no effective ability to mitigate losses or oust those in

25  default.  By precluding Plaintiffs' historic right to institute unlawful detainer

26  proceedings, Defendants have deprived Plaintiffs of the means to physically remove

27  defaulting tenants from their properties.  Defendants have thus stripped from

28  Plaintiffs the fundamental right to exclude — a right that "is 'one of the most

1  treasured' rights of property ownership." *Id.* at 2072 (quoting *Loretto*, 458 U.S. at
2  435).  The Eviction Moratorium thus constitutes "government-authorized physical
3  invasions . . . requiring just compensation." *Id.* at 2073.

4      62.    While the landlord-tenant relationship has historically been the subject
5  of regulation, property owners have never been subject to regulations requiring
6  persistent and indefinite occupation by defaulting and nonpaying tenants.

7      63.    Separate from the indefinite eviction prohibitions, the Eviction
8  Moratorium has also forced Plaintiffs to accept unauthorized pets and family
9  members into units, even where mutually agreed-upon leases prohibit pets and
10  additional occupants.  Such provisions constitute a distinct and independent *per se*
11  physical taking under *Loretto*, 458 U.S. at 434–36.  It is irrelevant that unauthorized
12  pets and family members may only be temporary occupants because, under the
13  Takings Clause, "physical appropriation is a taking whether it is permanent or
14  temporary." *Cedar Point Nursery*, 141 S. Ct. at 2074; *see also id.* at 2074–75
15  (collecting cases).

16      64.    In short, the Eviction Moratorium constitutes the functional equivalent
17  of the Defendants commandeering private property under the purported public
18  purpose of providing housing to tenants affected by the fallout from COVID-19.
19  The Eviction Moratorium and the enforcement thereof have caused a physical taking
20  of Plaintiffs' property without just compensation as required under the Takings
21  Clause of the Fifth Amendment to the U.S. Constitution.  This, in turn, has caused
22  proximate and legal harm to Plaintiffs.

23      65.    The United States Supreme Court has repeatedly acknowledged that
24  takings liability under the Fifth Amendment to the United States Constitution may
25  be redressed under 42 U.S.C. § 1983.

26      66.    Under 28 U.S.C. § 2201, Plaintiffs are entitled to declaratory relief
27  determining that the City's Ordinances effect a taking of private property under the
28  Takings Clause of the Fifth Amendment to the United States Constitution.

67.     Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law.  Plaintiffs are therefore entitled to an award of attorney's fees and litigation expenses pursuant to 42 U.S.C. § 1988.

## SECOND CLAIM FOR RELIEF

**Uncompensated Regulatory Taking in Violation of the**

**Fifth Amendment to the United States Constitution – 42 U.S.C. § 1983**

**(*By Plaintiffs against All Defendants*)**

68.     Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

69.     The Eviction Moratorium also constitutes a regulatory taking under the test embodied in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978).  To determine whether a governmental action effects a taking under *Penn Central*, courts weigh (1) "the economic impact of the regulation;" (2) "the extent to which the regulation has interfered with distinct investment-backed expectations;" and (3) "the 'character of the governmental action.'" *Lingle*, 544 U.S. at 537 (quoting *Penn Central Transp. Co.*, 438 U.S. at 124).  This three-part inquiry is "essentially ad hoc," but "turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Lingle*, 544 U.S. at 540.

70.     The Eviction Moratorium and the enforcement thereof have caused a regulatory taking of Plaintiffs' property without just compensation in violation of the Takings Clause of the Fifth Amendment to the U.S. Constitution.

71.     First, the economic impact of the Eviction Moratorium is severe and ruinous to Plaintiffs, who are contractually entitled to receive rent from tenants on a monthly basis and cannot long survive if tenants are permitted to continue occupying the properties rent-free for a sustained and indefinite period of time.  Indeed, Plaintiffs' tenants are over $20 million in arrears, to date.  The Eviction

1  Moratorium effectively prevents Plaintiffs from bringing unlawful detainer actions

2  to oust nonpaying tenants and mitigate further losses.

3       72.    Second, the Eviction Moratorium has undermined Plaintiffs'

4  "reasonable investment-backed expectations." Plaintiffs developed and/or

5  purchased their properties with the "objectively reasonable" expectation that they

6  would be able to charge rent for units and have legal recourse if tenants failed to pay

7  rent when contractually due. *See Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950

8  F.3d 610, 634–35 (9th Cir. 2020) (distinct investment-backed expectations must be

9  "objectively reasonable" and "unilateral expectation[s]'or 'abstract need[s]' cannot

10  form the basis of a claim that the government has interfered with property rights").

11  In fact, Plaintiffs made these business investments against the backdrop of

12  California's unlawful detainer statutory scheme designed to resolve disputes

13  between owners and defaulting tenants in an orderly, efficient and expeditious

14  manner. *Cf. Guggenheim v. City of Goleta*, 638 F.3d 1111, 1120 (9th Cir. 2010) (en

15  banc).

16       73.    Further, while the Eviction Moratorium theoretically allows Plaintiffs

17  to eventually attempt to collect unpaid rents, the ability to actually recover such

18  back rent from cash-strapped tenants is illusory, at best. In addition, the Eviction

19  Moratorium bans Plaintiffs from recovering any interest or late fees on missed rent,

20  thereby depriving Plaintiffs of the constitutional right to the time value of money.

21  *Cf. Fowler v. Geurin*, 899 F.3d 1112, 1118–19 (9th Cir. 2018) ("Because the right to

22  daily interest is deeply ingrained in our common law tradition, this property interest

23  is protected by the Takings Clause[.]").

24       74.    Finally, the "character of governmental action" is tantamount to a

25  physical invasion of private property. *Lingle*, 544 U.S. at 537. The Eviction

26  Moratorium effectively requires that Plaintiffs allow their tenants to continue to

27  occupy their properties free of charge *and* requires Plaintiffs to allow their tenants to

28  remain in possession for the foreseeable future. Indeed, courts look to whether a

1  regulation constitutes a "physical invasion" of private property to inform the

2  analysis for this factor. *See Penn Central Transport Co.*, 438 U.S. at 124 (noting

3  that "[a] 'taking' may be more readily found when the interference with property

4  can be characterized as a physical invasion by government"); *see also Andrus v.*

5  *Allard*, 444 U.S. 51, 65–66 (1979) (opining that the regulation upheld there "d[id]

6  not compel the surrender of the artifacts, and there is no physical invasion or

7  restraint upon them").

8      75.    Furthermore, as both the Central District of California and other courts

9  have recognized in similar contexts, the Eviction Moratorium here, and those like it,

10 are simply unprecedented and extreme by any measure. *See, e.g.*, *Apartment Ass'n*

11 *of L.A. Cty., Inc. v. City of Los Angeles*, No. CV 20-05193 DDP (JEMx), 500

12 F.Supp.3d 1088, 1096 (in a separate legal challenge to the City's ordinance, the

13 court noted that "no amount of prior regulation could have led landlords to expect

14 anything like the blanket Moratorium"); *Baptiste*, 490 F.Supp.3d at 384 ("a

15 reasonable landlord would not have anticipated . . . a ban on even initiating eviction

16 actions against tenants who do not pay rent and on replacing them with tenants who

17 do").

18     76.    In sum, the Eviction Moratorium does not merely "adjust[] the benefits

19 and burdens of economic life to promote the common good," *Penn Central Trans.*

20 *Co.*, 438 U.S. at 124, but instead effect a compensable taking. As a result, the City's

21 violation of the Takings Clause of the Fifth Amendment has caused proximate and

22 legal harm to Plaintiffs.

23     77.    Plaintiffs are entitled to recover just compensation for the taking of

24 private property, and any and all other damages under 42 U.S.C. § 1983.

25     78.    Plaintiffs found it necessary to engage the services of private counsel to

26 vindicate their rights under the law. Plaintiffs are therefore entitled to an award of

27 attorney's fees and litigation expenses pursuant to 42 U.S.C. § 1988.

28

Rutan & Tucker, LLP
attorneys at law

## THIRD CLAIM FOR RELIEF

### Uncompensated Taking in Violation of

### Article I, Section 19 of the California Constitution

### (*By Plaintiffs against All Defendants*)

79.     Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

80.     Like the federal Takings Clause embodied in the Fifth Amendment to the United States Constitution, Article I, § 19 of the California Constitution proscribes the "taking or damaging" of private property for public use unless "just compensation" has "first been paid to, or into court for, the owner."

81.     The Takings Clause embodied in Article I, Section 19 of the California Constitution, at least with respect to the merits of regulatory taking claims, has been interpreted congruently with the Takings Clause embodied in the Fifth Amendment to the United States Constitution. *Cf. San Remo Hotel L.P. v. City and Cty. of San Francisco,* 27 Cal.4th 643, 672–79 (2002) (California Supreme Court relying on physical and regulatory takings decisions interpreting federal takings claims to evaluate takings claim asserted under California Constitution).

82.     The Eviction Moratorium constitutes a taking or damaging of private property without just compensation in violation of Article I, Section 19 of the California Constitution.

83.     Plaintiffs are entitled to payment of "just compensation" for the taking pursuant to Article I, Section 19 of the California Constitution.

84.     Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law.  Plaintiffs are therefore entitled to an award of attorney's fees and litigation expenses pursuant to Cal. Code Civ. Proc. § 1036.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for an order and judgment against Defendants,

and each of them, as follows as to all causes of action:

1. A determination that Defendants' Eviction Moratorium and related actions effected an uncompensated taking of private property, entitling Plaintiffs' to an award of "just compensation" in an amount to be determined by jury;

2. Award Plaintiffs damages arising out of their Section 1983 and constitutional claims, and specifically "just compensation" under the Fifth and Fourteenth Amendments to the United States Constitution, and under Article I, section 19 of the California Constitution;

3. Award Plaintiffs their costs and reasonable attorney's fees and litigation expenses incurred in this action pursuant to 42 U.S.C. § 1988 and Cal. Code Civ. Proc. § 1036; and

4. Grant all other such relief to Plaintiffs as the Court may deem proper and just.

Dated:  August 4, 2021

RUTAN & TUCKER, LLP
DOUGLAS J. DENNINGTON
JAYSON PARSONS

By: _____
        Douglas J. Dennington
        Attorneys for Plaintiffs