Douglas J. Dennington (State Bar No. 173447)
ddennington@rutan.com
Jayson Parsons (State Bar No. 330458)
jparsons@rutan.com
RUTAN & TUCKER, LLP
18575 Jamboree Road, 9th Floor
Irvine, CA  92612
Telephone:  714-641-5100
Facsimile:  714-546-9035

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GHP MANAGEMENT CORPORATION, a California corporation  918 BROADWAY ASSOCIATES, LLC, a Delaware limited liability company dba "Broadway Palace Apartments;" LR 9th & BROADWAY, LLC, a California limited liability company dba "Broadway Palace Apartments;" PALMER TEMPLE STREET PROPERTIES, LLC, a California limited liability company dba "The Da Vinci Apartments;" PALMER/CITY CENTER II, L.P., a California limited partnership dba "The Da Vinci Apartments;" PALMER BOSTON STREET PROPERTIES I, L.P., a Delaware limited partnership dba "The Orsini;" PALMER BOSTON STREET PROPERTIES II, L.P., a Delaware limited partnership dba "The Orsini;" PALMER BOSTON STREET PROPERTIES III, L.P., a California limited partnership dba "The Orsini;" BRIDEWELL PROPERTIES, L.P., a California limited partnership dba "Pasadena Park Place;" PALMER ST. PAUL PROPERTIES, L.P., a California limited partnership dba "The Piero Apartments;" PALMER/SIXTH STREET PROPERTIES, L.P., a California limited partnership dba "The Piero Apartments;" FIGTER LTD., a California limited partnership dba "Skyline Terrace Apartments;" WARNER CENTER SUMMIT, LTD, a California limited partnership dba | Case No. 2:21-cv-06311-DDP-(JEMx) <br><br> *Judge:  Dean D. Pregerson* <br><br> **PLAINTIFFS' OPPOSITION TO CITY OF LOS ANGELES'S MOTION TO DISMISS UNDER FRCP 12(B)(1) AND 12(B)(6)** <br><br> Hearing Date:  December 6, 2021 <br> Time:  10:00 a.m. <br> Courtroom:  9C <br><br> Date Action Filed:    August 4, 2021 <br> Trial Date:               Not Set |

Rutan & Tucker, LLP
attorneys at law

560/036892-0001
17107378.3 a11/15/21

PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS

1  "Summit at Warner Center;"
   PALMER/THIRD STREET
2  PROPERTIES, L.P., a California limited
   partnership dba "The Visconti
3  Apartments,"

4              Plaintiffs,

5      vs.

6  CITY OF LOS ANGELES, and DOES
   1-25, INCLUSIVE,
7
              Defendants.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Rutan & Tucker, LLP
attorneys at law

560/036892-0001
17107378.3 a11/15/21

PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ..................................................................................1

II.   SUMMARY OF GENERAL FACT ALLEGATIONS SET
      FORTH IN COMPLAINT ....................................................................3

III.  ARGUMENT .......................................................................................5

      A.    Legal Standard ..........................................................................5

      B.    Takings Overview ......................................................................5

      C.    The Case is Ripe ........................................................................8

      D.    Plaintiffs Have Article III Standing to Prosecute Their
            Takings Claims Seeking "Just Compensation" ...................14

      E.    Plaintiffs Have Sufficiently Pled a Physical Taking..........................17

      F.    Plaintiffs Have Sufficiently Pled a Regulatory Taking ....................21

IV.   CONCLUSION ...................................................................................23

Rutan & Tucker, LLP
attorneys at law

560/036892-0001
17107378.3 a11/15/21

-i-

PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Alabama Ass'n of Realtors v. Department of Health & Human Services*,
141 S. Ct. 2485 (Aug. 26, 2021).....................................................1, 2, 18

*Andrus v. Allard*,
444 U.S. 51 (1979) ..................................................................................6

*Apartment Ass'n of Los Angeles County, Inc. v. City of Los Angeles*,
500 F.Supp.3d 1088 (C.D. Cal. 2020)............................................1, 23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...........................................................................5, 23

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ...........................................................................5, 23

*Broam v. Bogan*,
320 F.3d 1023 (9th Cir. 2003)..................................................................5

*Cedar Point Nursery v. Hassid*,
141 S. Ct. 2063 (2021) .....................................................................19, 20

*Ciampetti v. United States*,
18 Cl.Ct. 548 (1989).................................................................................17

*City of Oakland v. BP PLC*,
969 F.3d 895 (9th Cir. 2020) ...................................................................21

*Clark v. City of Lakewood*,
259 F.3d 996 (9th Cir. 2001) ...................................................................16

*Colony Cove Props., LLC v. City of Carson*,
888 F.3d 445 (9th Cir. 2018)...................................................................21

*Dolan v. City of Tigard*,
512 U.S. 374 (1994) ..................................................................................9

*FCC v. Florida Power Corp.*,
480 U.S. 245 (1987) ................................................................................18

*First English Evangelical Lutheran Church v. County of Los Angeles*,
482 U.S. 304 (1987) ................................................................................20

Rutan & Tucker, LLP
attorneys at law

560/036892-0001
17107378.3 a11/15/21

-ii-

PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS

**Page**

**FEDERAL CASES (CONT.)**

*Griggs v. Allegheny County,*
    369 U.S. 84 (1962) ........................................................................ 17

*In re Daou Sys., Inc.,*
    411 F.3d 1006 (9th Cir. 2005) ................................................... 5, 21

*Jacobs v. United States,*
    290 U.S. 13 . . . (1933) ................................................................ 9

*Kaiser Aetna v. United States,*
    444 U.S. 164 (1979) ...................................................................... 7

*Knick v. Twp. of Scott,*
    139 S. Ct. 2162 (2019) ........................................ 2, 9, 10, 11, 12, 13

*Lingle v. Chevron,*
    544 U.S. 528 (2005) .......................................................... 5, 6, 7, 8, 22

*Loretto v. Teleprompter Manhattan CATV Corp.,*
    458 U.S. 419 (1982) ....................................................... 1, 2, 6, 19, 20

*Lucas v. South Carolina Coastal Council,*
    505 U.S. 1003 (1992) .................................................................. 6, 7

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .................................................................... 14

*MacDonald, Sommer & Frates v. Yolo County,*
    477 U.S. 340 (1986) .................................................................... 11

*Maverick Media Group, Inc. v. Hillsborough Cty.,*
    528 F.3d 817 (11th Cir. 2008) ................................................... 17

*Maya v. Centex Corp.,*
    658 F.3d 1060 (9th Cir. 2011) ................................................... 15

*MedImmune, Inc. v. Genentech, Inc.,*
    549 U.S. 118 (2007) .................................................................... 12

*Nollan v. California Coastal Comm'n,*
    483 U.S. 825 (1987) .................................................................... 18

Rutan & Tucker, LLP
*attorneys at law*

560/036892-0001
17107378.3 a11/15/21

-iii-

Page

**FEDERAL CASES (CONT.)**

*Nuclear Info. & Res. Serv. v. NRC,*
457 F.3d 941 (9th Cir. 2006) .................................................................. 16

*Pakdel v. City & Cty. of San Francisco,*
141 S. Ct. 2226 (2021) ..................................... 2, 3, 4, 8, 9, 10, 11, 13, 18

*Pakdel v. City & Cty. of San Francisco,*
952 F.3d 1157 (9th Cir. 2020) .......................................................... 10, 19

*Penn Central Transport Co. v. New York City,*
438 U.S. 104 (1978) .............................................. 1, 7, 8, 20, 21, 22, 23

*Pennsylvania Coal Co. v. Mahon,*
260 U.S. 393 (1922) ................................................................................ 6

*San Diego Gas & Electric Co. v. San Diego,*
450 U.S. 621 (1981) (Brennan, J., dissenting) ....................................... 7

*Spokeo, Inc. v. Robins,*
576 U.S. 330 (2016) .............................................................................. 14

*Suitum v. Tahoe Reg'l Planning Agency,*
520 U.S. 725 (1997) ................................................................................ 9

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning
Agency,*
535 U.S. 302 (2002) .............................................................................. 19

*Terrace v. Thompson,*
263 U.S. 197 (1923) .............................................................................. 13

*United States v. Causby,*
328 U.S. 256 (1946) ................................................................................ 7

*United States v. City of Redwood,*
640 F.2d 963 (9th Cir. 1981) .................................................................. 5

*Vacation Village, Inc. v. Clark Cty.,*
497 F.3d 902 (9th Cir. 2007) .......................................................... 11, 17

Rutan & Tucker, LLP
attorneys at law

560/036892-0001
17107378.3 a11/15/21

-iv-

PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS

**Page**

FEDERAL CASES (CONT.)

*Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City,*
473 U.S. 172 (1985) ....................................................................... 9, 10, 12

*Yee v. City of Escondido,*
503 U.S. 519 (1992) ........................................................................... 18, 19

FEDERAL STATUTES

42 U.S.C. section 1983 ................................................................ 2, 8, 11, 12

CALIFORNIA STATUTES

Cal. Civ. Proc. Code section 1179.05 ...................................................... 15

OTHER AUTHORITIES

5B Arthur R. Miller et al., *Federal Practice & Procedure* section 1356
(3d ed. 2020) .......................................................................................... 21

California Constitution Article I, section 19 .............................................. 1

Rule 12(b)(6) ....................................................................................... 5, 21

United States Constitution Fifth Amendment ..................... 1, 5, 7, 9, 10, 19

United States Constitution Article III ........................... 5, 12, 13, 14, 15, 17

Rutan & Tucker, LLP
attorneys at law

560/036892-0001
17107378.3 a11/15/21

–v–

PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Plaintiffs seek one thing in this action: just compensation for the City's "taking" of their fundamental right to exclude defaulting tenants from their apartment communities.  Plaintiffs assert both a *per se* categorical taking under *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419 (1982), and a regulatory taking under *Penn Central Transport Co. v. New York City,* 438 U.S. 104 (1978).  To be clear, Plaintiffs have not sought to invalidate the City's COVID-19 eviction moratorium on a takings theory.  The issue is one of damages and, specifically, "just compensation," mandated by the Fifth Amendment to the United States Constitution and Article I, section 19 of the California Constitution.

In support of its Motion to Dismiss ("Motion"), the City cites a slew of district court opinions — including the decision rendered by this Court in *Apartment Ass'n of Los Angeles County, Inc. v. City of Los Angeles,* 500 F.Supp.3d 1088 (C.D. Cal. 2020) — all of which dealt with myriad attempts to invalidate various eviction moratoria adopted by local and state governments throughout the nation, some of which even included takings claims.  Yet the City fails to even mention the *most recent* eviction moratoria decision adopted by the Supreme Court in *Alabama Ass'n of Realtors v. Department of Health & Human Services*, 141 S. Ct. 2485 (Aug. 26, 2021).  In that 6-to-3 decision, the Court found that the CDC lacked congressional authority to even adopt the moratorium and blocked the CDC's efforts to extend it.  The portion of that decision that is relevant to this case (and, indeed, every case dealing with similar eviction moratoria) is Section II (B) of the opinion addressing the "equities" associated with such eviction moratoria:

> The moratorium has put the applicants, along with millions
> of landlords across the country, at risk of irreparable harm
> by depriving them of rent payments with no guarantee of
> eventual recovery.  Despite the CDC's determination that

Rutan & Tucker, LLP
attorneys at law

560/036892-0001
17107378.3 a11/15/21

-1-

PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS

> landlords should bear a significant financial cost of the
> pandemic, many landlords have modest means. *And*
> *preventing them from evicting tenants who breach their*
> *leases intrudes on one of the most fundamental elements of*
> *property ownership—the right to exclude*.

*Id*. at 2489 (citing *Loretto*, 458 U.S. at 435) (emphasis added).

At least six members of the Court have found the much less onerous national eviction moratorium to intrude on one of the "most treasured" rights of property ownership — the right to exclude.  The importance of that finding cannot possibly be lost on the City, as that is the sole inquiry in determining whether a particular government action constitutes a *per se* categorical, physical occupation taking.  And that is perhaps why the City works so hard in its Motion to Dismiss to manufacture procedural obstacles to Plaintiffs' lawsuit, such as ripeness and standing.  As the Supreme Court has also recently determined, takings claims brought under 42 U.S.C. § 1983 may be filed *as soon as the taking occurs*, "regardless of post-taking remedies that may be available to the owner."  *Knick v. Twp. of Scott,* 139 S. Ct. 2162, 2170 (2019); *see also Pakdel v. City & Cty. of San Francisco,* 141 S. Ct. 2226, 2231 (2021) (reaffirming that "administrative 'exhaustion of state remedies' is not a prerequisite for a takings claim when the government has reached a conclusive position" (quoting *Knick*, 139 S. Ct. at 2167)).

There is no question the City has reached a conclusive position with respect to its eviction moratorium.  Indeed, the Eviction Moratorium applies to all landlords and tenants operating and residing in the City.  The Moratorium provides no exception for any Los Angeles landlords.  Plaintiffs have alleged damages nearing $20 million as a result of the Moratorium.  While questions may arise concerning the amount of just compensation and the impact of government assistance, such questions have no bearing on whether a taking has occurred.  The case is ripe and Plaintiffs have suffered concrete, particularized injuries fairly traceable to the City's

Rutan & Tucker, LLP
attorneys at law

560/036892-0001
17107378.3 a11/15/21

-2-

PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS

1  moratorium.  A monetary judgment against the City will redress such injuries.  The
2  Motion should be denied in its entirety.

3  **II.**   **SUMMARY OF GENERAL FACT ALLEGATIONS SET FORTH IN**
4  **COMPLAINT**

5  Plaintiffs are the manager and owners of 13 different apartment communities
6  located within the jurisdictional limits of the City of Los Angeles ("City" or "Los
7  Angeles").  Dkt 3, ¶¶ 9–22.  As such, they were (and still are) subject to the City's
8  COVID-19 eviction moratorium ("Eviction Moratorium" or "Moratorium").  *Id.*
9  ¶¶ 39–42.

10  Among other things, the Eviction Moratorium prohibits landlords from
11  evicting (or "endeavoring to evict") tenants financially impacted by the pandemic
12  for the non-payment of rent, any "no fault" reasons otherwise available to landlords
13  to terminate tenancies, and any "unauthorized occupants or pets."  *Id.* ¶¶ 45–47.  The
14  Eviction Moratorium imposes no procedural obligation on the part of tenants to
15  either "attest" to their pandemic-related qualification for protection, nor does it
16  require tenants to even notify their landlords of their intent to withhold payment of
17  rent in light of the Moratorium.  *Id.* ¶ 48.  Needless to say, the Moratorium imposes
18  no obligation on the part of tenants to provide landlords with documentation
19  demonstrating qualification for protection under the Moratorium.

20  The Moratorium also fails to provide any tribunal or mechanism for owners to
21  contest a tenant's assumed qualification for protection. *Id.* ¶ 49.  The only way a
22  landlord could test a tenant's qualification (or to even compel the tenant to provide
23  documentation) would be to file an unlawful detainer action and "hope" the tenant
24  does not provide any evidence of qualification for protection.  Because the City also
25  provided tenants with a private cause of action to assert against *landlords only* for
26  violations of the Moratorium, a landlord would assume a grave risk of civil and
27  criminal penalties just to ascertain whether a tenant is entitled to protection. *Id*
28  (explaining that a tenant may file an action for civil penalties of up to $10,000 per

Rutan & Tucker, LLP
attorneys at law
560/036892-0001
17107378.3 a11/15/21
-3-
PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS

violation—plus an additional $5,000 for tenants who are elderly or disabled). "Thus, while landlords have been stripped of all remedies and any tribunal to adjudicate grievances, such as a court to protect their rights, tenants are free to go to court to assert monetary claims against their landlords." *Id.* ¶ 40.

As of the filing of the Complaint in August of this year, Plaintiffs had sustained rent losses approaching $20,000,000. *Id.* ¶¶ 10–22. As clearly alleged in the Complaint, these losses were specifically attributable to "numerous tenants" taking advantage of the Moratorium "to withhold payment of rent." *Id.* As set forth in Paragraph 51 of the Complaint:

> Plaintiffs contend that the Eviction Moratorium has actually
> and proximately caused rent losses in the amount of nearly
> $20 million, to date. Had Plaintiffs retained the ability to
> institute unlawful detainer proceedings against any tenants
> that failed to timely pay their contractual agreements, these
> losses would be minimal. Plaintiffs would also have been
> able to replace defaulting tenants with other, paying tenants.
> Presently, however, Plaintiffs have been required to allow
> defaulting tenants to accrue millions of dollars in back rents,
> and have been prevented from physically removing any
> defaulting tenants and replacing them with paying tenants. In
> adopting the Eviction Moratoria, the City fully understood
> that tenants would not have the means to pay all back rent (to
> the tune of tens of thousands of dollars) by the time the
> Eviction Moratoria and one-year grace period expired.
> Indeed, Plaintiffs are informed and believe, and based thereon
> allege, that the City orchestrated a regulatory regime to
> provide a compulsory and de facto rent forgiveness to be
> foisted on landlords throughout the City, including Plaintiffs.

Rutan & Tucker, LLP
attorneys at law

560/036892-0001
17107378.3 a11/15/21

-4-

PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS

1   As discussed below, Plaintiffs have more than satisfied the "general fact

2   allegation" pleading requirements for a federal court complaint.  The matter is ripe,

3   Plaintiffs clearly have Article III standing, and the Motion should be denied in its

4   entirety.

5   **III.   ARGUMENT**

6   **A.   Legal Standard**

7   Motions to dismiss under Rule 12(b)(6) are "viewed with disfavor," and

8   dismissal without leave to amend "is proper only in 'extraordinary' cases."

9   *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003), quoting *United States v. City*

10   *of Redwood*, 640 F.2d 963, 966 (9th Cir. 1981).  A plaintiff need not plead "detailed

11   factual allegations" to survive a motion to dismiss; rather, the allegations must be

12   "enough to raise a right to relief above the speculative level."  *Bell Atlantic Corp. v.*

13   *Twombly*, 550 U.S. 544, 555 (2007).  This means that a complaint must contain

14   "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

15   on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Twombly*, 550

16   U.S. at 570.  In deciding a motion to dismiss, the court must "accept the plaintiffs'

17   allegations as true and construe them in the light most favorable to plaintiffs."  *In re*

18   *Daou Sys., Inc.*, 411 F.3d 1006, 1013 (9th Cir. 2005); *Broam*, 320 F.3d at 1028;

19   *Iqbal*, 556 U.S. at 678.  Accordingly, the question of Plaintiff's ability to prove its

20   allegations, or possible difficulties in making such proof, is of no concern in ruling

21   on such a Motion.  *See, e.g.*, *Twombly*, 550 U.S. at 556 ("a well-pleaded complaint

22   may proceed even if it strikes a savvy judge that actual proof of those facts is

23   improbable, and 'that a recovery is very remote and unlikely.'").

24   **B.   Takings Overview**

25   The Takings Clause embodied in the Fifth Amendment proscribes the taking

26   of private property for public use, without just compensation.  *Lingle v. Chevron,*

27   544 U.S. 528, 536 (2005).  While once understood only to apply to "direct

28   appropriations" of private property (*i.e.*, involuntary government acquisitions

Rutan & Tucker, LLP
attorneys at law

560/036892-0001
17107378.3 a11/15/21

-5-

PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS

1 through the eminent domain process), modern takings jurisprudence carves out two

2 distinct categorical rules for *per se* takings, as well as a third, factually-intensive

3 inquiry for a regulation which does not evoke one of the *per se* categorical rules but

4 nevertheless, in the words of Justice Oliver Wendell Holmes, still "goes too far." *Id.*

5 at 537 (quoting *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415 (1922)).

6       The first categorical rule for *per se* takings relates to government-compelled

7 *occupations* of private property against the will of the property owner. *Lucas v.*

8 *South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992) ("[R]egulations that

9 compel the property owner to suffer a physical 'invasion' of his property" require

10 payment of just compensation "no matter how minute the intrusion, and no matter

11 how weighty the public purpose behind it.").  This rule was most famously

12 articulated by Justice Thurgood Marshall in *Loretto* where, writing for the majority

13 of the Court, he explained:

14             The historical rule that a permanent physical occupation of

15             another's property is a taking has more than tradition to

16             commend it.  Such an appropriation is perhaps the most

17             serious form of invasion of an owner's property interests.

18             To borrow a metaphor, *cf. Andrus v. Allard,* 444 U.S. 51,

19             65–66 (1979), the government does not simply take a

20             single "strand" from the "bundle" of property rights: it

21             chops through the bundle, taking a slice of every strand.

22 *Loretto*, 458 U.S. at 435.

23       As *Loretto* noted, the Supreme Court cases addressing the physical

24 occupation rule "uniformly have *found a taking to the extent of the occupation,*

25 *without regard to whether the action achieves an important public benefit or has*

26 *only minimal economic impact on the owner*." *Id.* at 434–35 (emphasis added); *see*

27 *also Lingle*, 544 U.S. at 538 ("[W]here government requires an owner to suffer a

28 permanent physical invasion of her property—however minor—it must provide just

Rutan & Tucker, LLP
*attorneys at law*

560/036892-0001
17107378.3 a11/15/21

-6-

PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS

1   compensation."); *see also Kaiser Aetna v. United States,* 444 U.S. 164, 176 (1979)

2   (holding government imposition of navigational servitude opening up public access

3   to private pond constitutes *per se* physical taking and emphasizing that a property

4   owner's "right to exclude others" represents "one of the most essential sticks in the

5   bundle of rights that are commonly characterized as property"); *United States v.*

6   *Causby*, 328 U.S. 256, 265 (1946) (easement of flight requires compensation under

7   Fifth Amendment).

8       Similar to the rule for physical occupations, the Supreme Court has also found

9   a categorical, *per se* taking where the government regulation or action "completely

10  deprive[s] an owner of '*all* economically beneficial us[e]' of her property." *Lingle*,

11  544 U.S. at 538 (discussing second categorical rule set forth in *Lucas*).  As with

12  government actions compelling the physical occupation of private property,

13  government regulations depriving an owner of "all economically beneficial or

14  productive use" of private property effect a categorical, *per se* taking of private

15  property necessitating the payment of just compensation.  *Lucas*, 505 U.S. at 1016.

16  As the *Lucas* Court suggested, the "total deprivation of beneficial use is, from the

17  landowner's point of view, the equivalent of a physical appropriation." *Id.* (citing

18  *San Diego Gas & Electric Co. v. San Diego*, 450 U.S. 621, 652 (1981) (Brennan, J.,

19  dissenting)).

20      Outside of these two categorical *per se* takings, government regulations and

21  actions are evaluated under a multi-factor inquiry to determine whether a taking has

22  occurred. *Lingle*, 544 U.S. at 538–39.  This essentially "ad hoc" factual inquiry was

23  first articulated in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978),

24  and is colloquially referred to as the "*Penn Central* test."  The factors to be

25  considered include the "economic impact of the regulation on the claimant," the

26  "extent to which the regulation has interfered with distinct investment-backed

27  expectations," and the "character of the government action" (*i.e.*, whether it is

28  tantamount to a government invasion or occupation or, instead, merely affects

Rutan & Tucker, LLP
*attorneys at law*

560/036892-0001
17107378.3 a11/15/21

-7-

PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS

1   property interests through "some public program adjusting the benefits and burdens

2   of economic life to promote the common good." *Id.* at 124; *see also Lingle*, 544 U.S.

3   at 538–39.

4          As noted above, Plaintiffs have asserted both a categorical "physical

5   occupation" taking and a *Penn Central* regulatory taking in this action.  Plaintiffs'

6   Complaint more than satisfies the pleading requirements for these claims.

7          **C.      The Case is Ripe**

8          The City's Motion reflects a fundamental misunderstanding of takings law

9   and the current standard for "ripeness" in the context of takings claims brought

10  under 42 U.S.C. § 1983.  Failing to even cite the most recent Supreme Court

11  decision on this *precise* issue (*Pakdel v. City & County of San Francisco*, 141 S. Ct.

12  2226 (June 28, 2021)), the City takes the remarkable position that the takings claims

13  in this case are not ripe, and will not be ripe, until Plaintiffs actually try to pursue

14  unlawful detainer proceedings against defaulting tenants (apparently when the

15  Moratorium is lifted at some point in the future), and in no event until sometime

16  *after* the expiration of the 12-month grace period the City afforded to tenants to pay

17  all outstanding back rent under the Moratorium (whenever that might occur).  The

18  City is dead wrong on all counts.[1]

19         In the context of takings claims filed under 42 U.S.C. § 1983, the prudential

20  doctrine of "ripeness" requires claimants to obtain a final decision from the

21  "regulator" as to the application of the regulation to the property before seeking

22  relief in federal district court.  *Pakdel*, 141 S. Ct. at 2230.  As *Pakdel* emphasizes:

23                The finality requirement is relatively modest.  All a plaintiff

24                must show is that "there [is] no question. . . about how the

25                "regulations at issue apply to the particular land in question."

26

27  [1]    The City also contends that landlords must first attempt to exhaust any and all
    available government rent assistance programs enacted in the State of California
    before a takings claim is "ripe" for review.  Not true.  While government rent
28  assistance programs may relate to the amount of "just compensation," such post-
    taking remedies are not germane to whether a taking has in fact occurred.

1   *Id.* (quoting *Suitum v. Tahoe Reg'l Planning Agency,* 520 U.S. 725, 739 (1997)).

2   　　　Where, as here, the regulations are set forth in a blanket ordinance applicable

3   to all residential rental properties located within the City without a process for

4   exceptions or variances to the prohibitions, there is simply no issue concerning the

5   "finality" of the City's Eviction Moratorium.  More colloquially, the Moratorium "is

6   what it is."  The Supreme Court made this crystal clear in *Knick,* where it overruled

7   the state-litigation requirement set forth in *Williamson County Regional Planning*

8   *Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172 (1985).[2]  In *Knick*, the

9   Court held that takings claimants need not avail themselves of any state *litigation*

10  remedies for the alleged taking before filing an action in the first instance in federal

11  court. *Knick,* 139 S. Ct. at 2179.  The Court reasoned that the Takings Clause

12  embodied in the Fifth Amendment is not (and never should have been) dependent

13  upon state court remedies, and that any such obstacle to pursuing such claims in

14  federal court "relegates the Takings Clause 'to the status of a poor relation' among

15  the provisions of the Bill of Rights." *Id.* at 2169 (quoting *Dolan v. City of Tigard,*

16  512 U.S. 374, 392 (1994)).  As the Court stated:

17  　　　　　The Fifth Amendment right to full compensation arises at the

18  　　　　　time of the taking, *regardless of post-taking remedies that*

19  　　　　　*may be available to the property owner*.  That principle was

20  　　　　　confirmed in *Jacobs v. United States,* 290 U.S. 13 . . . (1933),

21  　　　　　where we held that a property owner found to have a valid

22  　　　　　takings claim is entitled to compensation as if it had been

23  　　　　　'paid contemporaneously with the taking"—that is, the

24  _____

25  [2]   *Williamson County* involved a very different type of taking stemming from the denial of a development permit on non-vested and unentitled property.  The land owner filed its lawsuit directly in federal court, without attempting to obtain a

26  "variance" from the County's planning code and without first pursuing any available state-court remedies.  *Williamson County* refused to address the takings claims on

27  the merits, finding that the claims were not ripe.  The Court held that the available "variance" procedure in the county's administrative code, and any state court

28  remedies, should have been pursued as a prerequisite to filing the taking claim under the Fifth Amendment in federal district court.

1          compensation must generally consist of the total value of the

2          property taken, plus interest from that point in time.

3  *Knick,* 139 S. Ct. at 2170 (emphasis added).

4      While the Supreme Court left untouched *Williamson County*'s "administrative

5  finality" requirement for ripeness, that element of ripeness should not, as the City

6  now advocates, be construed to require the exhaustion of any and all post-taking

7  administrative remedies.  The most recent Supreme Court decision on this very

8  issue, decided only a few months ago in *Pakdel,* is instructive.  *Pakdel* addressed

9  whether San Francisco's "condominium conversion" ordinance, which conditioned

10  conversion on the property owners' commitment to offer "lifetime leases" to any

11  existing tenants, constituted a taking of private property in violation of the Fifth

12  Amendment. 141 S. Ct. at 2228.  The District Court granted San Francisco's motion

13  to dismiss, finding that the plaintiffs' failure to file an inverse condemnation action

14  in state court rendered the federal court action unripe.  *Id.* at 2228–29.  While the

15  case was on appeal to the Ninth Circuit, the Supreme Court issued its decision in

16  *Knick*, which overruled the "state litigation" requirement previously imposed as a

17  ripeness criterion in *Williamson County*.  *Pakdel*, 141 S. Ct. at 2229.  Rather than

18  remand the case back to the District Court to consider the ripeness claim in light of

19  *Knick*, the Ninth Circuit affirmed the District Court's dismissal on the grounds that

20  the plaintiffs had not sought a timely "exemption" from the ordinance

21  administratively. *Id.*  Not only did the Ninth Circuit uphold the District Court's

22  ripeness determination, but it also emphasized the fatal nature of plaintiffs' failure to

23  timely object to the lifetime lease requirement. *Id.*; *see also Pakdel v. City & Cty. of*

24  *San Francisco,* 952 F.3d 1157, 1166–67 (9th Cir. 2020) ("Moreover, we have held

25  in the analogous context of the then-binding state-litigation requirement that when a

26  plaintiff missed deadlines or failed to comply with other requirements for ripening a

27  federal takings claim, the claim must be dismissed.").

28      In a *per curiam* decision, the Supreme Court reversed the Ninth Circuit

Rutan & Tucker, LLP
*attorneys at law*

560/036892-0001
17107378.3 a11/15/21

-10-

PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS

decision, finding as a matter of law that plaintiffs had met the relatively modest "finality" requirement for ripeness.  *Id*. at 2230.  As the Supreme Court explained:

> The rationales for the finality requirement underscore that nothing more than *de facto* finality is necessary.  This requirement ensures that a plaintiff has actually "been injured by the Government's action" and is not prematurely suing over a hypothetical harm. [Citation omitted.] Along the same lines, because a plaintiff who asserts a regulatory taking must prove that the government "regulation has gone 'too far,'" the court must first "kno[w] how far the regulation goes." *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 348 (1986).  *Once the government is committed to a position, however, these potential ambiguities evaporate and the dispute is ripe for judicial resolution.*

*Id.* (emphasis added).

In the case of takings claims premised on a law or ordinance compelling a physical occupation of private property, as is alleged in this case, the first "administrative finality" requirement that *Knick* did not overrule does not even apply. *Vacation Village, Inc. v. Clark Cty.,* 497 F.3d 902, 912 (9th Cir. 2007) (explaining that "the first requirement, that the government entity reach a final decision regarding the application of the regulations to the property at issue, is 'automatically satisfied at the time of the physical taking' because '[w]here there has been a physical invasion, the taking occurs at once, and nothing the city can do or say after that point will change that fact'").

The City misconstrues the "relatively modest" finality element to ripeness in the takings context as imposing an administrative exhaustion requirement—a prerequisite the Supreme Court has time and again held to be an impermissible imposition on Section 1983 plaintiffs. *Pakdel*, 141 S. Ct. at 2230 (holding that the

Rutan & Tucker, LLP
attorneys at law

560/036892-0001
17107378.3 a11/15/21

-11-

PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS

guaranty of a "federal forum for claims of unconstitutional treatment at the hands of state officials" includes the "settled rule" that "'exhaustion of state remedies is not a prerequisite to an action under . . . § 1983'") (quoting *Knick*, 139 S. Ct. at 2167). Indeed, one of the rationales asserted by the Supreme Court for overruling the state litigation requirement set forth in *Williamson County* was that it "effectively established an exhaustion requirement for § 1983 takings claims." *Knick*, 139 S. Ct. at 2173.

The City repeatedly suggests that, in order for Plaintiffs to have standing to assert takings claims under the Eviction Moratorium, Plaintiffs must file unlawful detainer actions and be "denied" relief by the unlawful detainer court. *See, e.g.,* Dkt 17, at 2 ("Nor have [plaintiffs] alleged they have attempted to evict a tenant and were unable to do so because of the City's law, as opposed to other measures"). The Eviction Moratorium is clearly a remedial statute to be construed broadly in favor of tenants. The Eviction Moratorium provides no standard for determining whether a tenant can "afford to pay rent," but plainly covers any "decrease in income" or "increase in expenses" that may be traced to work closures or similar impacts from the pandemic. Thus, a tenant who suffers a decrease in income in any degree would qualify for protection. If a landlord wants to dispute a tenant's alleged qualification, the landlord has to choose between subjecting itself to civil penalties up to $15,000 per violation of the ordinance, or simply adhering to the tenant's claim. The law is clear that a federal court plaintiff need not subject itself to civil or criminal liabilities in order to achieve Article III standing to assert a federal violation. *See, e.g., MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 129-137 (2007) (holding that patent licensee did not have to subject itself to breach of licensing contract damages before challenging patent in federal court). As the Supreme Court noted in the context of challenging government actions:

> [W]here threatened action by *government* is concerned, we do
> not require a plaintiff to expose himself to liability before

Rutan & Tucker, LLP
*attorneys at law*

560/036892-0001
17107378.3 a11/15/21

-12-

PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS

1   bringing a suit to challenge the basis for the threat—for
2   example, the constitutionality of a law threatened to be
3   enforced.  The plaintiff's own action (or inaction) in failing to
4   violate the law eliminates the imminent threat of prosecution,
5   but nonetheless does not eliminate Article III jurisdiction. *Id.*
6   at 129 (citing *Terrace v. Thompson,* 263 U.S. 197 (1923)).

7   Not only does the most recent Supreme Court authority on ripeness in the
8   takings context make clear that state remedies need not be pursued prior to filing a
9   takings claim in federal court, but, as explained above, a plaintiff is never required
10  to subject itself to criminal or civil penalties before achieving Article III standing to
11  pursue constitutional or other federal claims challenging the government action.

12  Here, the taking occurred when the City's Eviction Moratorium first applied
13  to Plaintiffs' private apartment communities, requiring Plaintiffs (and landlords
14  throughout the City) to accept tenants who Plaintiffs would otherwise have evicted.
15  The fact that landlords may someday be able to recover some back rent from some
16  tenants does not in any way alter the Plaintiffs' rights to sue the City now for the
17  takings which have already occurred.  *Knick* and *Pakdel* make abundantly clear that
18  landlords already impacted by the Eviction Moratorium may pursue their takings
19  claims in federal district court *now*.  Plaintiffs are not required to wait several more
20  years to pursue their defaulting tenants in what would amount to be thousands of
21  individual lawsuits, and seek every last dime available under government rent
22  assistance, before suing the City for the takings it has already effected.  The
23  theoretical ability of landlords to sue their tenants in the future does not render
24  Plaintiffs' claims against the City—for the economic damages Plaintiffs have
25  already sustained by tenants withholding rent on account of the City's Eviction
26  Moratorium--unripe.  And whether or not Plaintiffs successfully recover every last
27  dime to which they are entitled under their leases, either by suing the tenants or
28  receiving government assistance, the City would *still* be liable to Plaintiffs for the

Rutan & Tucker, LLP
attorneys at law

560/036892-0001
17107378.3 a11/15/21

-13-

PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS

1  costs associated with seeking government assistance, any applicable late fees and
2  contractual and/or statutory interest the City deemed inappropriate for tenants to
3  pay, any unrecovered litigation expenses associated with such lawsuits, and any
4  other damages attributable to the Eviction Moratorium.

5       The case is ripe according to controlling Supreme Court precedent.

6  ### D.    **Plaintiffs Have Article III Standing to Prosecute Their Takings**
7         **Claims Seeking "Just Compensation"**

8       As this Court is well aware, the City has championed its Eviction Moratorium
9  from the very beginning of the pandemic and, even when the State of California
10  adopted its less onerous statewide residential eviction moratorium in August 2020,
11  the City believed it needed to keep its own, more protective Moratorium in place.
12  Indeed, the City warned of the "flood of evictions" that would have resulted in the
13  absence of its blanket ordinance, even with the state moratorium in effect.  Now,
14  with the two-year anniversary of the pandemic a few months away and with the state
15  moratorium having expired on the clear recognition it is no longer needed, the City
16  still has its Moratorium in place and has shown no signs of letting up.  It is ironic
17  indeed for the City to now suggest that out of the millions of dollars owed to
18  Plaintiffs, no amount can be traced to the City's own Eviction Moratorium.  The fact
19  that other government actors adopted other, less protective moratoria has no bearing
20  on the City's liability.  A constitutional violation does not somehow vanish simply
21  because other government actors may have committed similar constitutional
22  violations in the absence of the City's unconstitutional actions.

23       As has long been the test for the "irreducible constitutional minimum" for
24  federal court standing, the plaintiff must demonstrate that it (1) suffered an "injury
25  in fact" that is "concrete and particularized," (2) that is "fairly traceable" to the
26  challenged conduct of the defendant, and (3) that is likely to be redressed by a
27  favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992); *see*
28  *also Spokeo, Inc. v. Robins,* 576 U.S. 330, 338 (2016) (same).  At the pleading stage,

Rutan & Tucker, LLP
attorneys at law

560/036892-0001
17107378.3 a11/15/21
-14-

PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS

"general factual allegations" are sufficient to establish Article III standing. *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (reasoning that "on a motion to dismiss, we 'presume[e] that general allegations embrace those specific facts that are necessary to support the claim'").

As alleged in their Complaint, Plaintiffs include the property manager and owners of 13 apartment communities located within the City.  Dkt. 3, ¶¶ 9–22. Plaintiffs specifically alleged the substantial monetary losses sustained up to the filing of the Complaint for each apartment community.  *Id.*  Not only did Plaintiffs identify the specific monetary losses for each community, but they also alleged that the losses were as a result of the "numerous tenants" who had "taken advantage of the Eviction Moratorium to withhold payment of rent" during the pandemic. *Id.* at ¶¶ 10–22.  In addition, Plaintiffs alleged that each of the communities were "located within the City's territorial limits and, thus, [were] subject to the Eviction Moratorium." *Id.*  These allegations are more than sufficient to meet the "general factual allegation" standard required for pleading Article III standing. *See Maya,* 658 F.3d at 1068.

Defendants, however, assert that more is required and that, even at the pleading stage, Plaintiffs were required to plead specific facts demonstrating that each of the tenants who withheld payment of rent "qualified" for protection under the City's sweeping and plainly broad Moratorium, and that Plaintiffs were required to demonstrate that each of Plaintiffs' defaulting tenants did not qualify for protection under either the County of Los Angeles' moratorium (which has not been in place since October of 2020)[3] or the state-wide moratorium which recently expired.

---

[3]   The County's eviction moratorium was set to expire in October 2020, just after the State's adoption of AB 3088—the statewide residential moratorium.  Under AB 3088, the statewide moratorium, local governments like the County were unable to "extend" any residential eviction moratorium between August 19, 2020 and January 31, 2021. Cal. Civ. Proc. Code, § 1179.05.  When the statewide moratorium was extended, the prohibition on local eviction moratoria was likewise extended. Under the most recent extension embodied in AB 832, local governments are not allowed to extend or enact residential eviction moratoria before April 1, 2022,  *Id.* at § 1179.05(a)(1) ("Any extension, expansion, renewal, reenactment, or new adoption

Rutan & Tucker, LLP
attorneys at law

560/036892-0001
17107378.3 a11/15/21

-15-

PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS

1    As this Court will recall, the City's moratorium does not require tenants to

2 even notify their landlords of their qualification for protection.  Nor did the City's

3 moratorium require tenants to attest to their qualifications.  And unlike the statewide

4 moratorium which required tenants to pay 25% of their rental obligations between

5 September 1, 2020 and August 31, 2021, the City's moratorium required no

6 payment whatsoever from tenants.  While the City contends that tenants in Los

7 Angeles had a "choice" between the City's moratorium and the state moratorium,

8 the evidence that will ultimately be submitted in this case will show that Los

9 Angeles tenants, not surprisingly, chose to proceed under the City's much more

10 tenant-friendly moratorium.

11    The City cites a number of cases to argue that Plaintiffs' claims cannot be

12 "redressed" by a favorable judgment in this action.  Dkt 17, 12:10–24.  Plaintiffs, of

13 course, only seek "just compensation" in this proceeding through a monetary

14 judgment against the City.  Such a judgment would certainly "redress" Plaintiffs'

15 claims.  Moreover, the cases cited by the City on redressability all dealt with claims

16 seeking to invalidate and/or enjoin the challenged government action. *See, e.g.*,

17 *Nuclear Info. & Res. Serv. v. NRC,* 457 F.3d 941, 955 (9th Cir. 2006) (seeking to

18 "set aside" Nuclear Regulatory Committee's rule when Department of

19 Transportation's unchallenged rule caused identical injury); *Clark v. City of*

20

21 of a measure, however delineated, that occurs between August 19, 2020, and
March 31, 2022, shall have no effect before April 1, 2022").  As such, the County's

22 eviction moratorium has had zero impact on Plaintiffs' 13 apartment communities
located within the City of Los Angeles.  Because the City's Eviction Moratorium

23 only expires on the Mayor's declaration of the end of the local emergency period,
that Moratorium never expired and is still one of the few moratoria in California still

24 operative today.  As the City's own documents show, even the County
acknowledges that the state law preempts its ability to renew or adopt a new eviction

25 moratorium prior to March 31, 2022. City Request for Judicial Notice, Dkt.18-5, p.4
("Most importantly, the County is preempted under the State's new eviction statute,

26 through March 31, 2022, from enacting new or amending existing protections for
residential tenants related to nonpayment of rent due to COVID-19.")  In addition,

27 everyone agrees that the County's eviction moratorium had no impact on landlords
and tenants residing in the City, because the City had adopted its own.  If only the

28 County had adopted an eviction moratorium, then Plaintiffs would have named the
County in this action and not the City.

1  *Lakewood*, 259 F.3d 996, 1008–09 (9th Cir. 2001) (seeking to challenge and enjoin

2  licensing requirements); *Maverick Media Group, Inc. v. Hillsborough Cty.*, 528 F.3d

3  817, 820–21 (11th Cir. 2008) (seeking to overturn denial of sign permit application).

4        While multiple government actors who work in concert to create the same

5  injury may present redressability issues where only one government actor is sought

6  *to be enjoined*, that certainly is not the case where the remedy sought is a monetary

7  judgment against the government actor sued.  Indeed, one of the City's own cases,

8  *Clark*, makes the obvious point that "redressability" must be analyzed differently

9  depending upon the type of relief requested and holding that the plaintiff in that

10  action did have standing to assert monetary claims against the named defendant.

11  *Clark*, 259 F.3d at 1007–10 (noting that standing for "monetary relief" may not also

12  confer standing for "injunctive or declaratory relief" and that the plaintiff certainly

13  had standing to assert a claim for monetary relief without running afoul of the

14  redressability component to standing).  Whether or not the state could also be found

15  liable for any overlapping eviction restrictions is irrelevant to the City's liability for

16  the impact its Moratorium actually had. *See, e.g., Ciampetti v. United States,* 18

17  Cl.Ct. 548, 556 (1989) (takings claim properly asserted against federal government

18  concerning wetlands delineation, even though State of New Jersey had its own

19  overlapping delineation); *cf. Griggs v. Allegheny County,* 369 U.S. 84, 89-90 (1962)

20  (local entity promoting and operating airport not immunized from takings liability

21  simply because federal government also had some involvement).

22        Plaintiffs have sufficiently pled Article III standing to assert a monetary

23  takings claim in this case.

24        **E.**    **Plaintiffs Have Sufficiently Pled a Physical Taking**

25        The City analogizes its blanket Moratorium to mere "restrictions" placed on

26  the landlord/tenant relationship by local and state governments such as rent control

27  and similar limitations, and makes the bold proclamation that the Eviction

28  Moratorium does not *require* landlords to accept the physical occupation by third

Rutan & Tucker, LLP
attorneys at law

560/036892-0001
17107378.3 a11/15/21

-17-

PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS

party tenants.  There are tens of thousands of landlords in the City of Los Angeles that wish that were true.  The bottom line is that the Eviction Moratorium prevents landlords from even "endeavoring" to evict defaulting tenants impacted by the pandemic.  Nobody can seriously dispute that but for the Eviction Moratoria, those landlords would have every right to evict tenants in breach of their respective leases. While the local emergency is in place, tenants impacted by the pandemic may not be removed.  That is precisely why the Supreme Court—only a few months ago— found that the far less onerous national eviction moratorium "prevent[ed] [landlords] from evicting tenants who breach their leases" and, thus, "*intrude[d] on one of the most fundamental elements of property ownership—the right to exclude*."  *Alabama Ass'n of Realtors*, 141 S. Ct. at 2489 (Aug. 26, 2021) (emphasis added).

Failing to even mention the most recent pronouncement by the Supreme Court on this issue, the City predictably relies on *Yee v. City of Escondido*, 503 U.S. 519 (1992), for the broad proposition that once a landlord "opens his property" to tenants, a subsequent government action impacting that relationship can never effect a physical taking. Dkt. 17, at 16.  As noted previously, and with due respect to the City, six members of the Supreme Court obviously disagree.  Even *Yee* recognized that a landlord may very well succeed on a physical taking claim where the government prevents the termination of tenancies or compels a landowner to continue to rent its property: "A different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." *Id.* at 528 (citing *FCC v. Florida Power Corp.*, 480 U.S. 245, 251–52, n. 6 (1987); *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831–32 (1987)).

*Pakdel* is instructive on this issue as well.  Although the Supreme Court opinion primarily dealt with the Ninth Circuit's treatment of ripeness in the takings context, it also corrected the Ninth Circuit's view on whether *Yee* precluded a "physical taking" determination.  When affirming the district court's order

Rutan & Tucker, LLP
attorneys at law

560/036892-0001
17107378.3 a11/15/21

-18-

PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS

dismissing the challenge to San Francisco's condominium conversion ordinance, the Ninth Circuit rejected the property owner's "physical taking" claim under *Loretto*. 952 F.3d at 1162 n.4. As the City argues here, the Ninth Circuit held that the "lifetime lease" condition to conversion did not amount to a physical taking because the owners were not obligated to even apply for such a conversion. *Id.* Citing *Yee* for support, the Ninth Circuit explained that "the Lifetime Lease Requirement does not amount to a physical taking because Plaintiffs voluntarily applied for conversion under the ECP." *Id.*

The Supreme Court took note of the Ninth Circuit's finding in this regard and, after reversing the ripeness determination, recommended that the Ninth Circuit, on remand, give further consideration to the "physical taking" claim in light of the Supreme Court's decision in *Cedar Point Nursery v. Hassid,* 141 S. Ct. 2063 (2021). *Cedar Point* was a "physical occupation" case holding that California's regulation allowing union representatives limited access to agricultural workplaces up to 3 hours per day (and up to 120 days per year) constituted a *per se* categorical taking in violation of the Fifth Amendment. *Id.* at 2069, 2080.

The City's other attack on Plaintiffs' physical occupation claim—that the Moratorium might end some day and thus is not "permanent"—is contrary to controlling Supreme Court authority. As the Supreme Court emphasized in *Cedar Point*:

> To begin with, we have held that a physical appropriation is a taking whether it is permanent or temporary. Our cases establish that "compensation is mandated when a leasehold is taken and the government occupies property for its own purposes, even though that use is temporary."

*Id.* at 2074 (quoting *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 322 (2002)).

While the landmark decision on physical takings—*Loretto*—did use the word

Rutan & Tucker, LLP
attorneys at law

560/036892-0001
17107378.3 a11/15/21

-19-

PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS

"permanent" when it articulated the *per se* rule for such takings, that decision predates by several years the Court's decision in *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 318 (1987), where the Supreme Court held, in the context of a regulatory "*Penn Central* taking," that temporary takings are entitled to the very same just compensation requirements as "permanent" takings:

> These cases reflect the fact that "temporary" takings
> which, as here deny a landowner all use of his property,
> are not different in kind from permanent takings, for which
> the Constitution clearly requires compensation.

*Cedar Point* emphasized there is no reason for any distinction between permanent physical takings and temporary physical takings. 141 S. Ct. at 2075 ("The duration of an appropriation—just like the size of an appropriation . . . — bears only on the amount of compensation").

Under the City's rule, governments could acquire and possess temporary easements (such as those often acquired by governments in the eminent domain process for infrastructure construction) free of charge.  That obviously is not the case.  To landlords in the City, the past 21 months feel quite permanent.  The duration of the City's Moratorium only impacts the amount of just compensation to which Plaintiffs are entitled, not whether they are entitled to compensation in the first instance.

Plaintiffs have certainly met the "general factual allegations" standard for pleading a *per se* physical taking under *Loretto*.  At Paragraph 61 of the Complaint, Plaintiffs assert:

> The Eviction Moratorium requires that Plaintiffs continue
> furnishing their properties—indefinitely—to defaulting
> and nonpaying tenants.  Plaintiffs have no effective ability
> to mitigate losses or oust those in default.  By precluding

Rutan & Tucker, LLP
attorneys at law

560/036892-0001
17107378.3 a11/15/21

-20-

PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS

1      Plaintiffs' historic right to institute unlawful detainer

2      proceedings, Defendants have deprived Plaintiffs of the

3      means to physically remove defaulting tenants from their

4      properties. Defendants have thus stripped from Plaintiffs

5      the fundamental right to exclude—a right that "is 'one of

6      the most treasured rights of property ownership." . . . The

7      Eviction Moratorium thus constitutes "government-

8      authorized physical invasions . . . requiring just

9      compensation." Dkt. ¶ 61.

10     This Court should reject the City's claim that Plaintiffs have not stated a *per

11 *se* physical taking.

12     **F.      Plaintiffs Have Sufficiently Pled a Regulatory Taking**

13     Plaintiffs also sufficiently plead a regulatory taking claim. Such claims are

14 rarely susceptible to dismissal under F.R.C.P. 12(b)(6) because, as the Supreme

15 Court and others have made abundantly clear, their resolution depends on an "ad

16 hoc" and intensely fact-based analysis. *Penn Central*, 438 U.S. at 124; *see also*

17 *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 450 (9th Cir. 2018).

18 Defendant spills much ink discussing the various factors comprising the *Penn*

19 *Central* test, but this is beside the point. Plaintiffs' claims do not fail "as a matter of

20 law," contrary to what the Defendant suggests, because the inquiry is highly fact-

21 specific. Dkt. 17 at 18.

22     "[T]he purpose of a motion under Rule 12(b)(6) is to test the formal

23 sufficiency of . . . [a] claim for relief; the motion is not a procedure for resolving a

24 contest between the parties about the facts or the substantive merits of the plaintiff's

25 case." *City of Oakland v. BP PLC*, 969 F.3d 895, 910 (9th Cir. 2020) (quoting 5B

26 Arthur R. Miller et al., *Federal Practice & Procedure* § 1356 (3d ed. 2020)).

27 Taking Plaintiffs' allegations as true, as this Court must (*see In re Daou.*, 411 F.3d

28 at 1013), it is clear that the "well-pleaded complaint" rule is sufficiently satisfied.

As explained in Plaintiffs' Complaint (Dkt. 3), courts weigh three factors when applying the *Penn Central* test.  First is the "economic impact of the regulation," second is the "extent to which the regulation has interfered with distinct investment-backed expectations," and third is the "character of the governmental action." *Lingle v. Chevron U.S.A.*, 544 U.S. 528, 540 (2005).

In the Complaint here, Plaintiffs assert a regulatory taking based on the following:

Economic Impact: The Complaint alleges that the economic impact to Plaintiffs "is severe and ruinous" because Plaintiffs are contractually entitled to receive monthly rent from tenants and "cannot long survive if tenants are permitted to continue occupying the properties rent-free for a sustained and indefinite period of time." Dkt. 3, ¶ 71.  The Complaint also alleges that "Plaintiffs' tenants are over $20 million in arrears, to date," and that the "Eviction Moratorium effectively prevents Plaintiffs from bringing unlawful detainer actions to oust nonpaying tenants and mitigate further losses." *Id.*

Distinct Investment-Backed Expectations: Next, the Complaint alleges that the Eviction Moratorium "has undermined Plaintiffs' 'reasonable investment-backed expectations'" because Plaintiffs have "developed and/or purchased their properties with the 'objectively reasonable' expectation that they would be able to charge rent for units and have legal recourse if tenants failed to pay rent with contractually due." *Id.*, ¶ 72.  The Complaint also alleges that Plaintiffs made these investments "against the backdrop of California's unlawful detainer statutory scheme." *Id.*  Furthermore, Plaintiffs alleged that the potential for landlords to recover back rents owed at some point in the future is "illusory," and that the recovery on interest or late fees deprived Plaintiffs of the constitutional right to the time value of money. *Id.*, ¶ 73.

Character of the Government Action: Plaintiffs also alleged that the character of the government action here "is tantamount to a physical invasion of private property" because the Eviction Moratorium "effectively requires that Plaintiffs

Rutan & Tucker, LLP
attorneys at law

560/036892-0001
17107378.3 a11/15/21

-22-

PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS

1  allow their tenants to continue to occupy their properties free of charge" in addition

2  to requiring Plaintiffs "allow their tenants to remain in possession for the

3  foreseeable future." *Id.*, ¶ 74.  As this Court has previously recognized, the Eviction

4  Moratorium is by any measure simply unprecedented and extreme.  *See, e.g.*,

5  *Apartment Ass'n of L.A. Cty., supra,* 500 F.Supp.3d 1088, 1096 (C.D. Cal. 2020).

6          Taken together, it is clear that Plaintiffs' Complaint pleads facts sufficient to

7  satisfy the pleading requirements undergirding a well-pleaded complaint.  *Twombly*,

8  550 U.S. at 555; *Iqbal*, 556 U.S. at 678.  As alleged in the Complaint, the Eviction

9  Moratorium "does not merely 'adjust[] the benefits and burdens of economic life to

10 promote the common good.'"  *Penn Central*, 438 U.S. at 124.  This Court is not

11 asked at this time to reach the merits of Plaintiffs' claims, but only to assess the

12 sufficiency of Plaintiffs' Complaint under plausible pleading standards.  For

13 purposes of the pleading requirements, Plaintiffs have done enough.

14 **IV.    CONCLUSION**

15         For the foregoing reasons, Plaintiffs request the Court to deny the City's

16 Motion to Dismiss in its entirety.  Should the Court find any of Plaintiffs'

17 allegations to be deficient, of course, Plaintiffs request leave to amend.

18

19 Dated:  November 15, 2021              RUTAN & TUCKER, LLP
                                          DOUGLAS J. DENNINGTON
20                                        JAYSON PARSONS

21                                        By:/s/ Douglas J. Dennington
                                          _____
22                                            Douglas J. Dennington
                                              Attorneys for Plaintiffs
23

24

25

26

27

28

Rutan & Tucker, LLP
attorneys at law

560/036892-0001
17107378.3 a11/15/21                    -23-

PLAINTIFFS' OPPOSITION TO CITY OF
LOS ANGELES'S MOTION TO DISMISS