O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| GHP MANAGEMENT CORPORATION, | ) | Case No. CV 21-06311 DDP (JEMx) |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING MOTIONS TO DISMISS** |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF LOS ANGELES, | ) | [Dkt 17, 43] |
| | ) | |
| Defendant. | ) | |
| | ) | |

Presently before the court are two Motions to Dismiss
Plaintiffs' Complaint, one filed by Defendant City of Los Angeles
("the City") and the other filed by Intervenors Alliance for
Community Empowerment ("ACCE"); Strategic Actions for a Just
Economy ("SAJE"); and Coalition for Economic Survival ("CES")
(collectively, "Intervenors").  Having considered the submissions
of the parties, the court grants the motions and adopts the
following Order.

I.  **Background**

At the outset of the COVID-19 pandemic, the City enacted
Ordinance No. 186585, which was later updated by Ordinance No.
186606 (collectively, the "Eviction Moratorium" or "Moratorium").
Plaintiffs allege that the Eviction Moratorium "effectively

precludes residential evictions." (Complaint ¶ 45.) The
Moratorium prohibits landlords from terminating tenancies due to
COVID-related nonpayment of rent, any no-fault reason, certain
lease violations related to additional occupants and pets, or
removal of rental units from the rental market. (Complaint ¶ 46;
LAMC § 49.99.2, 49.99.4.)[1] Landlords are also prohibited from
charging interest or late fees on COVID-related missed rent. (LAMC
§ 49.99.2(D).) The Moratorium further allows tenants who have
missed rent payments a one-year period to pay delayed rent,
starting from the end of the ongoing local emergency period.
(Compl. ¶ 46; LAMC § 49.99.2) Tenants may sue landlords and seek
civil penalties for violations of the Moratorium. (Compl. ¶ 49;
LAMC § 49.99.7.)

Plaintiffs, comprised of (1) thirteen limited liability
corporations or limited partnerships that own apartment buildings
and (2) the management company that manages the buildings, own or
manage nearly five thousand apartment units in Los Angeles.
Plaintiffs allege that the Moratorium constitutes an uncompensated
taking of private property in violation of the Fifth Amendment's
Takings Clause, as well as the California Constitution's Takings
Clause. Plaintiffs' Complaint seeks an award of "just
compensation," costs, and attorney's fees, but does not seek to
invalidate or enjoin enforcement of the Moratorium.

Intervenors and the City now move separately to dismiss
Plaintiffs' Complaint.

---

[1] The City's Request for Judicial Notice is granted.

## II.  Legal Standard

A complaint will survive a motion to dismiss when it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  When considering a Rule 12(b)(6) motion, a court must "accept as true all allegations of material fact and must construe those facts in the light most favorable to the plaintiff." Resnick v. Hayes, 213 F.3d 443, 447 (9th Cir. 2000). Although a complaint need not include "detailed factual allegations," it must offer "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678.  Conclusory allegations or allegations that are no more than a statement of a legal conclusion "are not entitled to the assumption of truth." Id. at 679. In other words, a pleading that merely offers "labels and conclusions," a "formulaic recitation of the elements," or "naked assertions" will not be sufficient to state a claim upon which relief can be granted.  Id. at 678 (citations and internal quotation marks omitted).

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." Iqbal, 556 U.S. at 679.  Plaintiffs must allege "plausible grounds to infer" that their claims rise "above the speculative level." Twombly, 550 U.S. at 555-56.  "Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

**III. Discussion**

    A.   Per Se Taking

    Movants contend that the Moratorium is not a permanent physical invasion of Plaintiffs' properties, and therefore does not constitute a per se taking. (E.g., City Mot. at 15.) See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 440 (1982) ("We affirm the traditional rule that a permanent physical occupation of property is a taking.") In Loretto itself, the Supreme Court recognized "that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails[,] . . . [s]o long as these regulations do not require the landlord to suffer the physical occupation of a portion of his building by a third party." Id. Later, in Yee v. City of Escondido, Cal., 503 U.S. 519 (1992), the Court held that a combination of rent control laws and eviction protections that limited property owners' ability to evict tenants did not constitute governmental authorization of "a compelled physical invasion of property" that would constitute a per se taking. Yee, 503 U.S. at 527-28.

    In Yee, a local rent control ordinance limited a mobile home park owners' ability to raise rents, while a state law simultaneously protected mobile home owners' ability to transfer mobile homes sited on rented mobile home park land. Id. at 524-25. The park owners alleged that the rent control scheme, against the backdrop of the state law, constituted a physical taking of park land, insofar as it granted tenants and their successors "the right to physically permanently occupy and use the real property of

Plaintiff." Id. at 525.  The Court disagreed.  "When a landowner
decides to rent his land to tenants, the government may place
ceilings on the rents the landowner can charge, or require the
landowner to accept tenants he does not like, without automatically
having to pay compensation." Id. at 529 (internal citations
omitted).  "Petitioners' tenants were invited by petitioners, not
forced upon them by the government. . . .  A different case would
be presented were the statute, on its face or as applied, to compel
a landowner over objection to rent his property or to refrain in
perpetuity from terminating a tenancy." Id. at 528.

        In response to Movants' arguments that Yee controls here,
Plaintiffs argue primarily that Yee is no longer good law because
"six members of the Supreme Court obviously disagree" with its
central premise: that once a landlord chooses to rent to tenants,
the government may regulate the landlord-tenant relationship
without automatically engaging in a per se taking.  (Opp. to City
Mot. at 18:17.)  To support their assertion, Plaintiffs point to
the Supreme Court's recent decisions in Alabama Ass'n
of Realtors v. Department of Health & Human Services, 141 S. Ct.
2485 (2021), and Pakdel v. City & Cty. of San Francisco, 141 S. Ct.
2226 (2021).  These cases bear only tangentially however, if at
all, on the continued validity of Yee.  In Alabama Association of
Realtors, the Supreme Court granted an emergency application to
vacate a stay of a judgment invalidating the Centers for Disease
Control and Prevention ("CDC")'s eviction moratorium.  Alabama
Ass'n of Realtors, 141 S.Ct. at 2486, 2490.  The Court did not
address any takings issue anywhere in its opinion.  Although the
Court did, citing Loretto, recognize that the right to exclude is

5

"one of the most fundamental elements of property ownership," <u>Yee</u> acknowledged the very same principle.  <u>Id.</u>; <u>Yee</u>, 503 U.S. at 528 ("[T]he right to exclude is doubtless . . . one of the most essential sticks in the bundle of rights that are commonly characterized as property . . . .") (internal quotation marks omitted).

<u>Pakdel</u> did involve a takings claim, albeit a regulatory takings claim rather than a per se claim.  <u>Pakdel</u>, 141 S.Ct. at 2228.  The Court's opinion, however, was limited to the question whether petitioners were required to exhaust local government administrative procedures before filing suit pursuant to 42 U.S.C. § 1983, even after the local government had rendered a final regulatory decision.  <u>Id.</u>  In the course of answering that question in the negative, the Court stated in a footnote that "[o]n remand, the Ninth Circuit may give further consideration to [merits] claims in light of our recent decision in <u>Cedar Point Nursery v. Hassid</u>."[2] <u>Id.</u> at 2229 n.1 (citation omitted).  In <u>Cedar Point</u>, the Court concluded that a California law requiring farmers to grant union organizers access to private property for up to three hours per day, 120 days per year, constituted a per se physical taking. <u>Cedar Point Nursery v. Hassid</u>, 141 S. Ct. 2063, 2069, 2080 (2021). Although the Court did cite <u>Yee</u>, it did so only once, and then only as an example of a decision that has "described use restrictions that go 'too far' as 'regulatory takings.'" <u>Id.</u> at 2072.  The Court then observed that the "regulatory takings" label can be misleading where, as in <u>Cedar Point</u>, "a regulation results in a physical

_____

[2] The district court in <u>Pakdel</u> did not reach the merits of the takings claims.  <u>Pakdel</u>, 141 S.Ct. at 2228-29.

1  appropriation of property." Id.  The Court made no further mention

2  of Yee, let alone the principle that a regulation governing an

3  existing landlord-tenant relationship is distinguishable from a

4  regulation compelling physical occupation in the first instance, or

5  in perpetuity.  Thus, contrary to Plaintiffs' suggestion, the

6  Court's footnote in Pakdel, indicating that the Ninth Circuit

7  remains free to consider Cedar Point if and when the Ninth Circuit,

8  on remand, reaches merits issues that were never reached by the

9  district court, does little to vitiate Yee.[3]

10      This Court declines Plaintiffs' invitation to read the tea

11  leaves, such as they are, in Alabama Association of Realtors,

12  Pakdel, and Cedar Point.  None of those cases can be read to

13  abrogate Yee or its prescription that laws that "merely regulate

14  [landlords'] *use* of their land by regulating the relationship

15  between landlord and tenant" do not constitute per se takings.

16  Yee, 503 U.S. at 528 (emphasis original).

17      Plaintiffs also argue, briefly, that the Moratorium

18  constitutes a per se taking even under Yee because it "*requires*

19  _____

20  [3] This Court acknowledges that in Heights Apartments, LLC v.
    Walz, the Eighth Circuit found Yee distinguishable and applied
21  Cedar Point to sustain a per se takings challenge to an eviction
    moratorium.  Heights Apartments, 30 F.4th 720, 733 (8th Cir. 2022).
22  That has not, however, been the Ninth Circuit's approach.  In
    Ballinger v. City of Oakland, for example, the Ninth Circuit
23  addressed a takings challenge to an ordinance requiring payments to
    tenants prior to an eviction, even for good cause.  Ballinger, 24
24  F.4th 1287, 1292 (9th Cir. 2022), cert. denied sub nom. Ballinger
    v. City of Oakland, California, 142 S. Ct. 2777 (2022).  Citing to
25  both Cedar Point and Yee, the court applied the latter, concluding
    that even a regulation mandating payments from landlords to tenants
26  constituted a regulation of the use of property, and not a per se
    taking, such as those described in Yee, compelling the creation of
27  a new landlord-tenant relationship or barring the termination of a
    tenancy "in perpetuity."  Id. at 1293-94 (quoting Yee, 503 U.S. at
28  528).

1  the landowner to submit to the physical occupation of his land.

2  'This element of required acquiescence is at the heart of the

3  concept of occupation.'"  (Opp. to Intervenors' Mot. at 3:23-28.)

4  <u>Yee</u>, 503 U.S. at 527 (quoting <u>FCC v. Florida Power Corp.</u>, 480 U.S.

5  245, 252 (1987) (emphasis original)).  But, as in <u>Yee</u>, the

6  Moratorium does not swoop in out of the blue to force Plaintiffs to

7  submit to a novel use of their property.  Nor does the Moratorium

8  present the type of different case, contemplated by <u>Yee</u>, where a

9  regulation compels a landowner to "refrain in perpetuity from

10 terminating a tenancy."  <u>Id.</u> at 528.  The Moratorium only precludes

11 evictions for a limited, albeit indeterminate, time.  <u>Compare</u> <u>id.</u>

12 (discussing Cal.Civ.Code § 798.56(g) requirement of up to 12 months

13 notice prior to eviction).  "Put bluntly, no government has

14 required any physical invasion of petitioners' property. [The]

15 tenants were invited by [the landlords], not forced upon them by

16 the government."  <u>Yee</u>, 503 U.S. at 528; <u>see also</u> <u>Ballinger</u>, 24

17 F.4th at 1293 (No per se taking, even where regulation required

18 payment by landlord to tenants prior to eviction for good cause,

19 because landlord plaintiffs "voluntarily chose to lease their

20 property . . . .").  A regulation affecting that pre-existing

21 relationship is not a per se taking.

22     B.   Regulatory taking

23     "[W]hile property may be regulated to a certain extent, if

24 regulation goes too far it will be recognized as a taking."

25 <u>Pennsylvania Coal Co. v. Mahon</u>, 260 U.S. 393, 415 (1922).

26 "[C]ompensation is required only if considerations such as the

27 purpose of the regulation or the extent to which it deprives the

28 owner of the economic use of the property suggest that the

1   regulation has unfairly singled out the property owner to bear a
2   burden that should be borne by the public as a whole." <u>Yee</u>, 503
3   U.S. at 522-23 (citing <u>Penn Central Transportation Co. v. New York</u>
4   <u>City</u>, 438 U.S. 104, 123-125 (1978)).  The relevant <u>Penn Central</u>
5   factors "include the regulation's economic impact on the claimant,
6   the extent to which the regulation interferes with distinct
7   investment-backed expectations, and the character of the government
8   action." <u>MHC Fin. Ltd. P'ship v. City of San Rafael</u>, 714 F.3d
9   1118, 1127 (9th Cir. 2013).

10          1.  Economic Impact

11      The Ninth Circuit discussed the <u>Penn Central</u> factors,
12   including the economic impact factor, at length in <u>Colony Cove</u>
13   <u>Properties, LLC v. City of Carson</u>, 888 F.3d 445 (9th Cir. 2018).
14   As the court explained, "[n]ot every diminution in property value
15   caused by a government regulation rises to the level of an
16   unconstitutional taking." <u>Colony Cove</u>, 888 F.3d at 451.
17   Similarly, "the mere loss of some income because of regulation does
18   not itself establish a taking." <u>Id.</u>  Rather, courts look to
19   whether a regulation is "functionally equivalent to the classic
20   taking in which government directly appropriates private property
21   or ousts the owner from his domain."[4] <u>Id.</u> (quoting <u>Lingle v.</u>
22   <u>Chevron U.S.A. Inc.</u>, 544 U.S. 528, 539 (2005)).  Accordingly, the
23   threshold is high.  Indeed, the Ninth Circuit has observed that a
24   diminution in property value as high as 92.5% does not constitute a
25   taking, and no court has found a taking where the diminution of
26   value does not exceed 50%.  <u>Id.</u>

27   _____

28      [4] This same fundamental inquiry underpins analyses of per se
takings.  <u>See Lingle</u>, 544 U.S. 538-39.

1    To determine a diminution in value for purpose of evaluating
2  the economic impact on a plaintiff, courts "compare the value that
3  has been taken from the property with the value that remains in the
4  property." Colony Cove, 888 F.3d at 451 (quoting Keystone
5  Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 497 (1987)).
6  Here, however, Plaintiffs' Complaint does not allege any particular
7  diminution in value, or specific pre- or post-Moratorium values
8  from which a level of diminution could be calculated.

9    Plaintiffs assert that this pleading deficiency is not fatal,
10 and that they need not allege any quantitative facts pertaining to
11 valuation, because the Ninth Circuit's Colony Cove opinion is
12 wrong.  (Opp. to Intervenors' Mot. at 6:1-4, 7 n.4.)  Plaintiffs
13 contend that because the Penn Central factor analysis is
14 "essentially ad hoc," the allegation that Plaintiffs have lost
15 rents as a result of the Moratorium is alone sufficient to satisfy
16 the economic impact factor.  See Penn Central, 438 U.S. at 124.

17    Even if this Court were to agree with the substance of
18 Plaintiffs' arguments, the court could not simply disregard Colony
19 Cove and excuse Plaintiffs of their burden to allege and show the
20 requisite adverse economic impact.  "A district court bound by
21 circuit authority . . . has no choice but to follow it, even if
22 convinced that such authority was wrongly decided." Hart v.
23 Massanari, 266 F.3d 1155, 1175 (9th Cir. 2001).  Plaintiffs'
24 allegation that their tenants are $20 million in arrears is
25 presented in a vacuum, and cannot alone demonstrate a significant
26 economic impact, notwithstanding Plaintiffs' vague and conclusory
27 allegation that "the economic impact of the Eviction Moratorium is
28 severe and ruinous."  (Compl. ¶ 71.)

10

2.   Interference with investment-backed expectations

The next <u>Penn Central</u> factor is "the extent to which the
regulation has interfered with distinct investment-backed
expectations." <u>Penn Central</u>, 438 U.S. at 124. "To 'expect' can
mean to anticipate or look forward to, but it can also mean 'to
consider probable or certain,' and 'distinct' means capable of
being easily perceived, or characterized by individualizing
qualities." <u>Guggenheim v. City of Goleta</u>, 638 F.3d 1111, 1120 (9th
Cir. 2010) (en banc). "To form the basis for a taking claim, a
purported distinct investment-backed expectation must be
objectively reasonable." <u>Colony Cove</u>, 888 F.3d at 452; <u>see</u> <u>also</u>
<u>Connolly v. Pension Ben. Guar. Corp.</u>, 475 U.S. 211, 226 (1986).
"[W]hat is relevant and important in judging reasonable
expectations is the regulatory environment at the time of the
acquisition of the property." <u>Bridge Aina Le'a, LLC v. Land Use</u>
<u>Comm'n</u>, 950 F.3d 610, 634 (9th Cir. 2020) (internal quotation marks
and citation omitted). "[T]hose who do business in [a] regulated
field cannot object if the legislative scheme is buttressed by
subsequent amendments to achieve the legislative end."
<u>Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers</u>
<u>Pension Tr. for S. California</u>, 508 U.S. 602, 645 (1993) (quoting
<u>FHA v. The Darlington, Inc.</u>, 358 U.S. 84, 91 (1958)) (internal
alterations omitted).

Movants argue that Plaintiffs knowingly chose to invest in the
highly-regulated rental housing market, and that any subjective
expectations Plaintiffs may have had that the regulatory
environment would remain static were and are objectively
unreasonable. The City raised, and this Court rejected, a similar

1  argument in the context of a Contracts Clause challenge to the same
2  Moratorium at issue here.  See Apartment Ass'n of Los Angeles
3  Cnty., Inc. v. City of Los Angeles, 500 F. Supp. 3d 1088, 1095
4  (C.D. Cal. 2020), aff'd, 10 F.4th 905 (9th Cir. 2021), cert.
5  denied, 212 L. Ed. 2d 595, 142 S. Ct. 1699 (2022).  Had Plaintiffs
6  acquired their rental properties in the midst of the pandemic,
7  Movants' argument might be more compelling.  The regulatory
8  environment existing prior to the pandemic, however, gave
9  Plaintiffs little reason to expect that they might be barred from
10 evicting tenants for nonpayment of rent.  Bridge Aina Le'a, 950
11 F.3d at 634.  "'Distinct investment-backed expectations' implies
12 reasonable probability, like expecting rent to be paid, not starry
13 eyed hope of winning the jackpot if the law changes.  A landlord
14 buys land burdened by lease-holds in order to acquire a stream of
15 income from rents and the possibility of increased rents or resale
16 value in the future."  Guggenheim, 638 F.3d at 1120 (emphases
17 added).  As this Court has stated, "the scope and nature of the
18 COVID-19 pandemic, and of the public health measures necessary to
19 combat it, have no precedent in the modern era, and [] no amount of
20 prior regulation could have led landlords to expect anything like
21 the blanket Moratorium."  Apartment Ass'n of Los Angeles, 500
22 F.Supp. 3d at 1096; see also Baptiste v. Kennealy, 490 F. Supp. 3d
23 353, 390 (D. Mass. 2020).  The extent to which the Moratorium
24 interferes with Plaintiffs' reasonable expectations thus weighs in
25 favor of a regulatory taking.
26         3.   Character of the Moratorium
27     "A 'taking' may more readily be found when the interference
28 with property can be characterized as a physical invasion by

government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." <u>Penn Central</u>, 438 U.S. at 124.  For example, rent control ordinances intended to shield residents from "excessive rent increases," have been found to constitute "precisely such a program."  <u>Colony Cove</u>, 888 F.3d at 454.  Here, there can be little doubt the Moratorium is geared toward promoting the common good.  Indeed, the Moratorium is predicated on the City's findings that "[t]he COVID-19 pandemic threatens to undermine housing security and generate unnecessary displacement of City residents."  (LAMC § 49.99.)  There can be little dispute that, absent the Moratorium's protections, significant numbers of tenants with COVID-related loss of income would have been evicted, resulting not only in the harms typical of mass displacements, but exacerbating the spread of COVID-19 as well, to the detriment of all.  Other courts, addressing similar regulations, have reached the same conclusion. <u>See</u>, <u>e.g.</u>, <u>Baptiste</u>, 490 F. Supp. At 390 (D. Mass. 2020); <u>S. California Rental Hous. Ass'n v. Cty. of San Diego</u>, No. 3:21CV912-L-DEB, 2021 WL 3171919, at *9 (S.D. Cal. July 26, 2021).

With respect to the "character" factor, Plaintiffs largely reiterate their argument, rejected above, that the Moratorium is a per se taking.  Beyond that, Plaintiffs contend in a footnote that, although rent control schemes may qualify as sufficiently public-oriented, the Moratorium "is far different and significantly more serious."  (Opp. to Intervenors' Mot. at 9 n.5.)  Plaintiffs do not, however, explain how a regulation intended to minimize the displacement of financially vulnerable tenants in the midst and as a result of a public health emergency unprecedented in modern

history is less protective of the common good than are rent control
ordinances.  As to seriousness, it is not clear to the court what
bearing the "seriousness" of the Moratorium has on the public
nature of its purpose.  To the extent Plaintiffs intend to
emphasize the shifting of financial burdens from tenants to
landlords, the Ninth Circuit has recognized that commonplace
regulations, including rent control, zoning schemes, and other land
use restrictions, "can also be said to transfer wealth from the one
who is regulated to another." Yee, 503 U.S. at 529.  And, to the
extent Plaintiffs use the word "serious" to refer to the degree of
the Moratorium's financial effects, they have failed, as discussed
above, to plead any facts establishing a "serious" economic impact.

4.   Balance of Penn Central factors

Plaintiffs have adequately alleged that the Moratorium has
interfered with the reasonable, investment-backed expectations
Plaintiffs had when they acquired their rental properties.  The
Complaint does not, however, allege any diminution in value, let
alone a diminution high enough to function as the equivalent of a
classic taking.  Because the Moratorium also indisputably promotes
the common good, the balance of the Penn Central factors weighs
heavily against a determination that the Moratorium constitutes a
regulatory taking.

**IV.  Conclusion**

For the reasons stated above, the motions to dismiss are
GRANTED.[5]  Plaintiffs' Complaint is DISMISSED, with leave to amend.

_____

[5] Having determined that Plaintiffs' Complaint fails to allege
either a per se or regulatory taking, the court does not reach the
City's arguments that any takings claims are unripe, or that

(continued...)

14

Any amended complaint shall be filed within twenty-one days of the date of this Order.


IT IS SO ORDERED.


Dated: November 17, 2022

DEAN D. PREGERSON
United States District Judge

---

[5](...continued)
Plaintiffs lack standing to assert any such claims.